UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, SENIOR JUDGE

—————————————————————————————

| | : |
|---|---|
| AMERICAN DREW, INC., *et al.*, | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | :     Court No. 17-00086 |
| | : |
| UNITED STATES OF AMERICA, *et al.,* | : |
| | : |
| Defendants. | : |

—————————————————————————————

## **JUDGMENT ORDER**

Upon reading plaintiffs' Rule 56.1 motion for judgment on the administrative record and for reconsideration; defendants' response thereto; upon other papers and proceedings had herein; and upon due deliberation, it is hereby

ORDERED that plaintiffs' motion for reconsideration be, and hereby is, denied; it is further

ORDERED that plaintiffs' motion for judgment on the administrative record be, and hereby is, denied; and it is further

ORDERED that judgment is entered for the United States.


—————————————————————————

TIMOTHY C. STANCEU, SENIOR JUDGE


Dated: New York, New York
         This _____ day of _____ , 2021.

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, SENIOR JUDGE

_____
                                                                    :
AMERICAN DREW, INC., *et al.*,                       :
                                                                    :
                                   Plaintiffs,            :
                                                                    :
                     v.                                         :        Court No. 17-00086
                                                                    :
UNITED STATES OF AMERICA, *et al.,*          :
                                                                    :
                                   Defendants.          :
_____:


### DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR
### JUDGMENT ON THE AGENCY RECORD AND FOR RECONSIDERATION


                                                         BRIAN M. BOYNTON
                                                         Acting Assistant Attorney General

                                                         JEANNE E. DAVIDSON
                                                         Director

                                                         JUSTIN R. MILLER
                                                         Attorney-in-Charge
                                                         International Trade Field Office

*Of Counsel*                                         BEVERLY A. FARRELL
SUZANNA HARTZELL-BALLARD        Senior Trial Attorney
JESSICA PLEW                                      Civil Division, Dept. of Justice
Office of Assistant Chief Counsel         Commercial Litigation Branch
U.S. Customs and Border Protection     26 Federal Plaza – Suite 346
6650 Telecom Drive, Suite 101             New York, NY 10278
Indianapolis, Indiana 46278                   Tel. (212) 264-9230 or 0483
                                                         Attorneys for Defendants


Dated:  August 9, 2021

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

STATEMENT PURSUANT TO RULE 56.1(c)(1) ............................................. 4

    I.      Administrative Determination Under Review ........................................ 4

    II.     The Issues Presented For Review .......................................................... 4

PRIOR PROCEEDINGS ...................................................................................... 5

FACTUAL HISTORY ........................................................................................... 6

    A.  The Statutory Language Of The CDSOA ........................................... 6

    B.  The Rulemaking Process ....................................................................... 7

    C.  The NPRM And Final Rule Provided Notice That Only Interest Pursuant To 19 U.S.C. § 1677g Would Be Distributed ................................... 9

    D.  The Trade Facilitation and Trade Enforcement Act (TFTEA) ....................... 11

ARGUMENT ....................................................................................................... 13

    I.      STANDARD OF REVIEW ............................................................. 14

    II.     THE CDSOA UNAMBIGUOUSLY DIRECTS THAT ONLY DUTIES AND INTEREST PURSUANT TO 19 U.S.C. § 1677g ARE TO BE DISTRIBUTED ..... 15

        A.  The Plain Language Of The CDSOA ............................................. 15

            1.The CDSOA only provides for the deposit and distribution of section 1677 interest ....................................................................... 16

            2.Statutes should be construed contextually, not by parsing words or clauses ................................................................... 19

            3.The Final Rule gives effect to Congress' statutory scheme and the terms of the statute ..................................................................... 21

4. Congress' findings and legislative history regarding the CDSOA do not support an interpretation that "all interest" includes section 1505(d) interest ................................................................................................... 23

III.    EVEN IF THE CDSOA IS AMBIGUOUS AS TO WHAT INTEREST SHOULD BE DISTRIBUTED, CUSTOMS FINAL RULE REASONABLY INTERPRETED 19 U.S.C. § 1675c AND IS ENTITLED TO *CHEVRON* DEFERENCE ................. 25

    A.   Distributing Only Section 1677g Interest To ADPs Is Reasonable And Supports Congress' Purpose ................................................................................. 26

    B.   Congress Delegated To Customs The Authority To Administer the CDSOA .... 27

    C.   The Existence Of An Introductory Discussion (Preamble) To Customs' Final Rule That Provides Clarity To Customs' Rulemaking Does Not Preclude Deference To Those Rules .......................................................................................... 28

    D.   The Final Rule Distributing Only Section 1677g Interest Is Not Arbitrary Or Capricious And Is Entitled To *Chevron* Deference ............................................. 33

IV.    PLAINTIFFS' REQUEST FOR RECONSIDERATION SHOULD BE DENIED ........................................................................................ 38

CONCLUSION ........................................................................................................... 42

## **TABLE OF AUTHORITIES**

### **Cases**

*American Drew v. United States*,
  450 F. Supp. 3d 1378 (Ct. Int'l Trade 2020) ................................................................... *passim*

*Am. Hi-Fi Int'l, Inc. v. United States*,
  936 F. Supp. 1032 (Ct. Int'l Trade 1996) .............................................................. 18

*Ammex Inc. v. United States*,
  341 F. Supp. 2d 1308 (Ct. Int'l Trade 2004) .......................................................... 14

*Armour v. City of Indianapolis*,
  566 U.S. 673 (2012) .................................................................................................. 37

*Camp v. Pitts*,
  411 U.S. 138 (1973), *aff'd*, 419 F.3d 1342 (Fed. Cir. 2005) .................................. 14

*Candle Corp. of Am. v. United States*,
  374 F.3d 1087 (Fed. Cir. 2004) ........................................................................ 15, 16

*Caraco Pharm. Labs, Ltd. v. Novo Nordisk A/S*,
  566 U.S. 399 (2012) .................................................................................................. 19

*Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984) ......................................................................................... *passim*

*Chickasaw Nation v. United States*,
  534 U.S. 84 (2001) .................................................................................................... 18

*Consol. Edison Co. of N.Y., Inc. v. Abraham*,
  314 F.3d 1299 (Fed. Cir. 2002) (*per curiam*) ........................................................ 37

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*,
  447 U.S. 102 (1980) .................................................................................................. 15

*DaimlerChrysler Corp. v. United States*,
  361 F.3d 1378 (Fed. Cir. 2004) ............................................................................... 14

*DAK Americas LLC v. United States*,
  Court No. 17-00195, 2018 WL 375816 (Ct. Int'l Trade Aug. 6, 2018) .................... 3

*Energy Corp. v. Riverkeeper, Inc.*,
  556 U.S. 208 (2009) ........................................................................... 13

*Ford Motor Co. v. United States*,
  30 C.I.T. 1587 (2006) ........................................................................ 39
  992 F. Supp. 2d 1346 (Ct. Int'l Trade 2014) ................................. 11, 38

*Gardner v. State of N.J.*,
  329 U.S. 565 (1947) ........................................................................... 20

*Guangdong Wireking Housewares & Hardware Co., Ltd. v. United States*,
  745 F.3d 1194 (Fed. Cir. 2014) .......................................................... 2

*Hudson v. Principi*,
  260 F.3d 1357 (Fed. Cir. 2001) ..................................................... 11, 38

*Intergraph Corp. v. Intel Corp.*,
  253 F.3d 695 (Fed. Cir. 2001) ....................................................... 11, 38

*K Mart Corp. v. Cartier, Inc.*,
  486 U.S. 281 (1988) ........................................................................... 21

*Morton v. Ruiz*,
  415 U.S. 199 (1974) ........................................................................... 27

*Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*,
  499 U.S. 117 (1991) ........................................................................... 20

*Norsk Hydro Canada, Inc. v. United States*,
  472 F.2d 1347 (Fed. Cir. 2006) ......................................................... 16

*Pakfood Pub. Co. v. United States*,
  753 F. Supp. 2d 1334 (Ct. Int'l Trade 2011) .................................... 37

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
  242 F.3d 1337 (Fed. Cir. 2001) ..................................................... 20-21

*SKF USA Inc. v. United States*,
  556 F.3d 1337 (Fed. Cir. 2009), *cert. denied*, 560 U.S. 903 (2010) ......................................... 2

*Skidmore v. Swift & Co.*,
  232 U.S. 134 (1944) ...................................................................... 35-36

iv

*Smiley v. Citibank*,
  517 U.S. 735 (1996) ................................................................. 33, 34

*Southern Shrimp Alliance v. United States*,
  617 F. Supp. 2d 1334 (Ct. Int'l Trade 2009) ......................... 24, 35, 36

*Totes-Isotoner Corp. v. United States*,
  580 F. Supp. 2d 1371 (Ct. Int'l Trade 2008) ............................... 39

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
  484 U.S. 365 (1988) ...................................................................... 21

*United States v. Haggar Apparel Co.*,
  526 U.S. 380 (1999) ...................................................................... 15

*United States v. Mead Corp.*,
  533 U.S. 218 (2001) ...................................................................... 33

*United States v. White*,
  846 F.2d 678 (11th Cir. 1988) ................................................. 11, 38

*Utility Air Regulatory Group v. E.P.A.*,
  573 U.S. 302 (2014) ...................................................................... 13

## Statutes, Regulations, and Rules

5 U.S.C. § 706 .................................................................................. 14

5 U.S.C. § 706(2)(A) ....................................................................... 14

19 U.S.C. § 580 ............................................................................ 4, 12

19 U.S.C. § 1505(d) ................................................................... *passim*

19 U.S.C. § 1671(a) ........................................................................... 2

19 U.S.C. § 1671f(b) ....................................................................... 17

19 U.S.C. § 1673 ................................................................................ 1

19 U.S.C. § 1673f(b) ....................................................................... 17

19 U.S.C. § 1675c ...................................................................... *passim*

19 U.S.C. § 1675c(a) ..................................................................... 2, 6

19 U.S.C. § 1675c(b) ......................................................................................... 6, 35

19 U.S.C. § 1675c(c) ..................................................................................... 6, 27, 28

19 U.S.C. § 1675c(d) ....................................................................................... 6, 29

19 U.S.C. § 1675c(d)(3) .................................................................................. *passim*

19 U.S.C. § 1675c(e)(1) ......................................................................................... 6

19 U.S.C. § 1675c(e)(2) .................................................................................. *passim*

19 U.S.C. § 1675c(e)(3) ............................................................................... 7, 17, 28

19 U.S.C. § 1677g ........................................................................................... *passim*

19 U.S.C. § 4401 ...................................................................................... 3, 4, 11, 12

19 U.S.C. § 4401(c)(1) ............................................................................... 3, 4, 13

19 U.S.C. § 4401(c)(2) ......................................................................................... 4

28 U.S.C. § 1581(i) ............................................................................................. 14

28 U.S.C. § 2636(i) .............................................................................................. 5

28 U.S.C. § 2640(e) ............................................................................................ 14

44 U.S.C. § 1507 ................................................................................................ 11

Agriculture, Rural Development, Food and Drug Administration and Related Agencies –
    Appropriations,
    Pub. L. No. 106, 387, 114 Stat. 1549 (2000) ...................................................... 2, 30

Claims Resolution Act of 2010,
    Pub. L. No. 111-291, 124 Stat. 3064 (2010) ....................................................... 3, 12

Deficit Reduction Act of 2005,
    Pub. L. No. 109-171, 120 Stat. 4 (2006) ............................................................ 3, 11

Tax Relief, Unemployment Insurance Reauthorization and Job Creation Act of 2010,
    Pub. L. No. 111-312, 124 Stat. 3296 (2010) ............................................................. 3

Trade Facilitation and Trade Enforcement Act of 2015,
    Pub. L. No. 114-125, 130 Stat. 122 (2016) ........................................ 3, 11-12, 13, 25, 27

19 C.F.R. part 159, subpart F ........................................................................... 8

19 C.F.R. § 159.64(e) ............................................................................... *passim*

19 C.F.R. § 159.64(f) ....................................................................................... 8

U.S.C.I.T. Rule 54(b) ............................................................................... 38, 39

U.S.C.I.T. Rule 56.1(c)(1) .............................................................................. 4

## **Additional Materials**

Antonin Scalia & Bryan A. Garner,
    READING LAW: THE INTERPRETATION OF LEGAL TESTS (2012) ........................... 15, 24

*Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers*,
    66 Fed. Reg. 33,920 (Dep't Treas. Customs Serv. June 26, 2001) .................................. *passim*

*Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers*,
    66 Fed. Reg. 48,546 (Dep't Treas. Customs Serv. Sept. 21, 2001) ................................. *passim*

Tudor N. Rus, *The Short Unhappy Life of the Byrd Amendment*,
    10 N.Y.U. J. Legis. & Pub. Pol'y 427 (2007) ........................................................... 2

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, SENIOR JUDGE

_____

|  |  |  |
|---|---|---|
| AMERICAN DREW, INC., *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Court No. 17-00086 |
| | : | |
| UNITED STATES OF AMERICA, *et al.,* | : | |
| | : | |
| Defendants. | : | |

_____

### DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD AND FOR RECONSIDERATION

Defendants (the Government) respectfully submit our response in opposition to plaintiffs' Rule 56.1 motion for judgment on the agency record and for reconsideration.

### INTRODUCTION

Beginning with the Antidumping Act of 1916 and followed by the Antidumping Act of 1921, Congress promulgated legislation to prevent "dumping," *i.e.*, introducing a product into another country's commerce at less than its normal value, by foreign companies.  Similarly, since 1890 with the enactment of the McKinley Tariff Act and its countervailing duty provision, Congress has addressed the problem of unfair competition caused by foreign governments subsidizing their own exports.   These laws were eventually incorporated into the Tariff Act of 1930.

Antidumping and countervailing (AD/CV) duties work to protect domestic industries from unfair pricing and subsidy practices by foreign producers and foreign governments.  The antidumping statute, 19 U.S.C. § 1673, combats this practice by providing for the assessment of increased tariffs on such imports.  19 U.S.C. § 1673.  Similar to antidumping duties,

countervailing duties are increased tariffs intended to offset foreign governments' subsidization of the production of goods imported into the United States. 19 U.S.C. § 1671(a). However, "the primary purpose of antidumping and countervailing duties generally is *remedial*, not punitive." *Guangdong Wireking Housewares & Hardware Co., Ltd. v. United States*, 745 F.3d 1194, 1206 (Fed. Cir. 2014).

Historically, the supplemental duties triggered by the AD/CV duty laws of the United States, along with any interest, were deposited into the U.S. Treasury's General Fund to support general governmental operations. This longstanding policy changed with the advent of the Continued Dumping and Subsidy Offset Act of 2000 (CDSOA), an amendment inserted by Senator Robert Byrd into the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act of 2001 during conference committee negotiations, codified at 19 U.S.C. § 1675c.[1] Under the Byrd Amendment, as the CDSOA was colloquially known, U.S. Customs and Border Protection (Customs or CBP) was directed to distribute to affected domestic producers (ADPs) "[d]uties assessed pursuant to a countervailing duty order, an antidumping duty order, or a finding under the Antidumping Act of 1921." 19 U.S.C. § 1675c(a).

The Byrd Amendment was constitutionally challenged under First Amendment and equal protection grounds. *See, e.g., SKF USA Inc. v. United States*, 556 F.3d 1337 (Fed. Cir. 2009) *cert. denied*, 560 U.S. 903 (2010). The U.S. Court of Appeals Federal Circuit upheld the Byrd Amendment noting that the amendment is "within the constitutional power of Congress to enact, furthers the government's substantial interest in enforcing the trade laws, and is not overly broad." *SKF USA*, 556 F.3d at 1360.

---

[1] *See* Tudor N. Rus, *The Short, Unhappy Life of the Byrd Amendment*, 10 N.Y.U. J. Legis. & Pub. Pol'y 427 (2007).

The Byrd Amendment was also challenged before the World Trade Organization (WTO) by eleven foreign nations. *DAK Americas LLC v. United States*, Court No. 17-00195, 2018 WL 375816, *3 (Ct. Int'l Trade Aug. 6, 2018). The WTO found that distributions under the Byrd Amendment were "inconsistent with the commitments made by the United States in the Uruguay Round Agreements." *Id.* The CDSOA was repealed in February 2006 by the Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 7601, 120 Stat. 4, 154 (2006). *Id.* However, notwithstanding the repeal, the Deficit Reduction Act provided that "[a]ll duties on entries of goods made and filed before October 1, 2007, that would, but for [the repeal], be distributed . . . shall be distributed as if section 754 of the Tariff Act of 1930 [*i.e.*, 19 U.S.C. § 1675c] had not been repealed." *Id.* (alterations in the original). CDSOA distributions were further limited in 2010 by prohibiting payments to ADPs with respect to entries of goods that, as of December 8, 2010, were (1) unliquidated; (2) not in litigation; and (3) not under an order of liquidation from the Department of Commerce (Commerce). *See* Claims Resolution Act of 2010, Pub. L. No. 111-291, § 822, 124 Stat. 3064, 3162-63 (2010), as amended by the Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010, Pub. L. No. 111-312, § 504, 124 Stat. 3296, 3308 (2010).

Finally, the CDSOA was amended by the Trade Facilitation and Trade Enforcement Act of 2015. Pub. L. No. 114-125, § 605, 130 Stat. 122, 187-88 (2016), codified at 19 U.S.C. § 4401 (TFTEA). Permissible distributions under TFTEA are those associated with the collections for entries that remained distributable after the CDSOA's repeal and the Claims Resolution Act, as amended. Under TFTEA, such permissible distributions were to include interest "realized through application of a payment received on or after October 1, 2014, by [Customs] under, or in connection with (A) a customs bond pursuant to a court order or judgment; or (B) a settlement

3

with respect to a customs bond, including any payment made to [Customs] with respect to that bond by a surety." 19 U.S.C. § 4401(c)(1).  The types of interest described by section 4401(c)(1) include interest accrued under 19 U.S.C. § 1677g and 19 U.S.C. § 1505(d), along with any equitable or 19 U.S.C. § 580 interest awarded by a court against a surety under its bond for late payment of antidumping or countervailing duties.  19 U.S.C. § 4401(c)(2).  TFTEA is limited to interest realized through the application of surety bond payments.  And nothing in section 4401 requires or authorizes delinquency interest received from a dilatory importer to be distributed to ADPs.

## STATEMENT PURSUANT TO RULE 56.1(c)(1)

**I.**     **Administrative Determination Under Review**

Plaintiffs challenge CBP's rule that does not distribute 19 U.S.C. § 1505(d) delinquency interest to ADPs under the CDSOA.  The promulgation of the rule is provided at *Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers*, 66 Fed. Reg. 48,546 (Dep't Treas. Customs Serv. Sept. 21, 2001) (codified at 19 C.F.R. §§ 159.61-64) (the Final Rule).  The Final Rule contains 19 C.F.R. § 159.64(e), which provides that only "statutory interest charged on antidumping and countervailing duties at liquidation [*i.e.,* interest provided under 19 U.S.C. § 1677g] will be transferred to the Special Account, when collected from the importer" for distribution to ADPs.

**II.**    **The Issues Presented For Review**

1.     Whether the Final Rule is consistent with the clear and unambiguous directives of the CDSOA.

2.      If the requirements of the CDSOA are not clear, whether the Final Rule is

reasonable and entitled to deference pursuant to *Chevron, U.S.A. Inc. v. Natural Resources*

*Defense Council, Inc.*, 467 U.S. 837 (1984).

## PRIOR PROCEEDINGS

Through their Complaint, plaintiffs commenced this action to challenge CBP's regulation

setting forth its practice of not distributing interest under 19 U.S.C. § 1505(d) (delinquency

interest) to ADPs under the CDSOA.  Plaintiffs sought delinquency interest dating back to the

first time they were eligible to, and did, receive distributions as ADPs under the CDSOA.

*American Drew v. United States*, 450 F. Supp. 3d 1378, 1383 (Ct. Int'l Trade 2020).  Because

plaintiffs became eligible to receive distributions no later than Fiscal Year 2006, *id.* at 1388, and

commenced their litigation in 2017, defendants moved to dismiss plaintiffs' claims as time-

barred based on the two-year statute of limitations of section 2636(i).  *Id.* at 1383.

After full briefing on the motion to dismiss, oral argument, and supplemental briefing, the

Court issued its decision holding that plaintiffs' claims challenging 19 C.F.R. § 159.64(e) were

untimely for CDSOA distributions made prior to April 18, 2015.  *Id.* at 1388-1389.  The Court

further found that plaintiffs' only remaining claims are those relating to the application of section

159.64(e) to their individual distributions made on or after April 18, 2015.  *Id.* at 1389.

In accordance with the Court's decision and scheduling orders, defendants filed the

public administrative record on August 6, 2020 and, after the Court entered a protective order,

the confidential administrative record on August 14, 2020.  Plaintiffs moved to correct,

supplement and/or strike the administrative record.  After briefing, the Court declined to strike

the administrative record but ordered defendants to supplement the record.  Defendants filed the

corrected administrative record on March 2, 2021.

**FACTUAL HISTORY**

**A.  The Statutory Language Of The CDSOA[2]**

The general statement to the CDSOA, which amended the Tariff Act of 1930, states that "[d]uties assessed pursuant to a countervailing duty order, an antidumping duty order, or a finding under the Antidumping Act of 1921 shall be distributed on an annual basis under this section to the affected domestic producers for qualifying expenditures."  19 U.S.C. § 1675c(a). The act then provides a series of definitions, none of which define interest.  19 U.S.C. § 1675c(b).

Next, the act charges the Commissioner of Customs to "prescribe procedures for distribution of the continued dumping or subsidies offset" and that, among other things, "[s]uch distribution shall be made" "from duties assessed during the preceding fiscal year."  19 U.S.C. § 1675c(c).  Paragraphs 1 and 2 of subsection (d) of the act discuss the eligibility of ADPs. Paragraph 3 of subsection (d) provides that "[t]he Commissioner shall distribute all funds (including all interest earned on the funds) from assessed duties received in the preceding fiscal year to [ADPs] based on the certifications described in paragraph (2)."  19 U.S.C. § 1675c(d).

Finally, subsection (e) of the act addresses the special accounts from which distributions to ADPs are to be made.  Paragraph 1 requires Customs to establish in the U.S. Treasury special accounts associated with antidumping duty orders or findings or countervailing duty orders. 19 U.S.C. § 1675c(e)(1).  Paragraph 2 provides in pertinent part that Customs "shall deposit into the special accounts, all antidumping or countervailing duties (including interest earned on such duties) that are assessed after the effective date of this section under the antidumping order or finding or the countervailing duty order with respect to which the account was established."

---

[2] The original statutory language of the CDSOA, as adopted in 2000, is set forth in an attachment to this Response.

19 U.S.C. § 1675c(e)(2).  Paragraph 3 charges Customs with promulgating regulations "[c]onsistent with the requirements of subsections (c) and (d)" that prescribe the time and manner in which distributions of the funds in a special account shall be made.  19 U.S.C. § 1675c(e)(3).

**B.  The Rulemaking Process**

After enactment of the CDSOA, Customs set up a Task Force to determine the necessary steps to implement the provisions of the CDSOA.  Administrative Record Supplement (herein "ARS") 504.  On November 16, 2000, the Task Force turned to the meaning of the legislation's language, noting that, because the provisions had been inserted at a House-Senate conference on an agriculture appropriations bill, Customs had no opportunity to comment on them or to seek clarification from Congress, and no report language from the Appropriations Committees existed to provide guidance.  ARS504.  The Task Force recognized that numerous items required follow up before implementation recommendations could be made.  ARS504-507.

On February 21, 2001, the Task Force met again to discuss work assignments to implement the CDSOA.  Among other things, the Task Force determined that section 1677g interest should be included in the special accounts for disbursement.  ARS511.  However, whether section 1505 interest could be assigned to specific AD/CV duty cases was under consideration.  ARS511.  The Task Force also grappled with computer system requirements to implement the special accounts required by the CDSOA, to enable liquidation and reliquidation processing, to account for section 1677g interest assessed on underpayments of AD/CV duty deposits, and to produce distributions to ADPs.  ARS513-528.  Customs' automated system was created before the existence of the CDSOA and had limitations, including that it did not – and does not – identify 19 U.S.C. § 1505(d) delinquency interest on particular line-items in an entry.

7

ARS006 at ¶ 4.  As a result, Customs' automated system did not differentiate the amount of 19 U.S.C. § 1505(d) delinquency interest, if any, that was attributable to CDSOA-subject lines of an entry.  ARS006 at ¶ 4.  By May 29, 2001, the Task Force had reached a draft plan for the implementation of the CDSOA.  ARS530-539.

Through a Federal Register Notice published on June 26, 2001, Customs proposed to amend the Customs Regulations to add a new subpart F to part 159 (19 C.F.R. part 159, subpart F; §§ 159.61-159.64) that prescribed the procedures for the distribution of assessed antidumping and countervailing duties and interest that would be distributed under the CDSOA.  66 Fed. Reg. 33920.  ARS128, 131.  This June 2001 Notice of Proposed Rulemaking (NPRM) provided for the submission of public comments on the proposed regulations before adoption of those regulations as a Final Rule.  ARS128, 131.  The NPRM explained that no interest would accrue on the special accounts and clearing accounts established to facilitate distributions.  ARS130.  "However, if there is interest paid by the importer on any antidumping or countervailing duties billed in the liquidation process for the import entries, that interest will be transferred to the Clearing Account or Special Account, as appropriate."  ARS130.  Further, the NPRM explained that except for any overpayment to an ADP, any distribution made in accordance with 19 U.S.C. § 1675c(d)(3) will be final and conclusive on the ADP.  ARS131.  The NPRM also set forth proposed amendments to CBP's Regulations including section 159.64(e) addressing interest on special and clearance accounts and section 159.64(f) addressing the final and conclusive nature of distributions.  ARS134.

In response to the June 2001 Notice, forty comments were received.  ARS137-138, 140-142.  These comments were addressed in the Final Rule.  66 Fed. Reg. 48,546.  ARS493-502.

**C.  The NPRM And Final Rule Provided Notice That Only Interest Pursuant To 19 U.S.C. § 1677g Would Be Distributed**

The proposed regulation in the NPRM stated, in relevant part, that "no interest will accrue in these accounts.  However, statutory interest charged on antidumping and countervailing duties at liquidation, will be transferred to the Clearing Account or Special Account, as appropriate, when collected from the importer."  ARS134.  In response to the NPRM, six public commenters agreed with Customs' treatment of interest as proposed in section 159.64(e).  *See* ARS147, 149 (The Timken Company) ("The issue of interest on underpayments is properly reflected in proposed rule 159.64(e) and in the description of the law and proposed regulations."); ARS251-252 (The Torrington Company); ARS315 (The North Dakota Farmers for Profitable Agriculture); ARS352 (Micron Technology, Inc.); ARS391 (U.S. Senators, including Sen. Robert Byrd) and ARS414 (PPG Industries, Inc.).  Two public commenters suggested that interest should nonetheless accrue on the clearing account and special accounts.  ARS261, 347.  Customs noted that such accrual was not permissible and explained that "only interest charged on antidumping and countervailing duty funds themselves, pursuant to the express authority in 19 U.S.C. § 1677g, will be transferred to the special accounts and be made available for distribution under the CDSOA."  ARS497.

A number of public commenters also discussed whether section 1677g interest that Customs pays to importers on refunds of overpaid antidumping or countervailing duty deposits, where the deposit amount was more than the final assessed amount, should be deducted from the clearing account or special accounts or otherwise affect the offset for an order or finding.  ARS144, 232, 240, 252, 347, 352,391, and 414.  Customs explained that "Interest paid by Customs when deposits exceed the amount of the duties assessed will not be taken from either

9

the clearing account or the special account" and "does not reduce the computation of the continued dumping and subsidy offset for an order or finding that would be distributed to affected domestic producers."  ARS497.

Notably, six members of the Senate participated in the notice-and-comment rulemaking, including Senator Byrd, and – as is relevant here – stated in their public comment:

> we appreciate the fact that you intend to distribute pursuant to the Act the full amount of assessed antidumping and countervailing duties, including interest paid by the importer at final liquidation but without any adjustment for interest remitted to the importer.  In our view, any other construction of the Act would significantly undermine its purpose.

ARS391.  While the Senators' public comment identified some areas of concern regarding other portions of the proposed regulations (ARS391-392), the Senators who enacted the CDSOA did not articulate any concerns with Customs' proposed treatment of interest.  *Id.*

In connection with the Government's motion to dismiss plaintiffs' claims as time-barred, the Court held that 19 C.F.R. § 159.64(e) "standing alone, informs the reader that interest on antidumping and countervailing duties 'charged . . . at liquidation'" references section 1677g interest and cannot be seen as referring to section 1505(d) delinquency interest.  *American Drew*, 450 F. Supp. 3d at 1385.  This is so because delinquency interest is not charged at liquidation and delinquency interest can accrue "only after liquidation has occurred and only if the importer does not satisfy the obligation to pay the liquidated duties within the allowed 30-day period."  *Id.* Thus, section 159.64(e) implies that other types of interest, such as delinquency interest, will not be placed into the clearing or special accounts.  *Id.*  Further, the Court recognized that the Final Notice's response to commenters that "[t]hus, only interest charged on antidumping and countervailing funds themselves, pursuant to the express authority in 19 U.S.C. § 1677g, will be

10

transferred to the special accounts and made available under the CDSOA" served as clear notice that only section 1677g interest would be included in the distributions. *Id.*[3]

### D.  The Trade Facilitation and Trade Enforcement Act (TFTEA)

As will be discussed below, plaintiffs argue that the TFTEA, codified at 19 U.S.C. § 4401, shows that the "interest" referenced in the CDSOA includes delinquency interest under section 1505(d). Pl. Br. at 29. A simple review of the plain language of TFTEA reveals the contradiction of plaintiffs' position. Specifically, section 4401 provides:

> (a) **IN GENERAL**
> The Secretary of Homeland Security shall deposit all interest described in subsection (c) into the special account established under section 1675c(e) of this title (repealed by subtitle F of title VII of the Deficit Reduction Act of 2005 (Public Law 109–171; 120 Stat. 154)) for inclusion in distributions described in subsection (b) made on or after February 24, 2016.
>
> (b) **DISTRIBUTIONS DESCRIBED** Distributions described in this subsection are distributions of antidumping duties and countervailing duties assessed on or after October 1, 2000, that are made under section 1675c of this title (repealed by subtitle F of title

---

[3] Plaintiffs' contention that they first learned that Customs was not distributing section 1505(d) interest in 2016, Pl. Br. at 5, 15, 29, is contrary to the Court's determination. Because the Court has issued an opinion in connection with this action, the doctrine of "law of the case" is implicated. The law of the case doctrine encompasses issues expressly decided or "decided by necessary implication." *United States v. White*, 846 F.2d 678, 684 (11th Cir. 1988); *see also Ford Motor Co. v. United States*, 992 F. Supp. 2d 1346, 1355 (Ct. Int'l Trade 2014). "The doctrine of law of the case generally bars retrial of issues that were previously resolved." *Intergraph Corp. v. Intel Corp.*, 253 F.3d 695, 697 (Fed. Cir. 2001). Whether to apply this doctrine is within the discretion of the Court. *Hudson v. Principi*, 260 F.3d 1357, 1363 (Fed. Cir. 2001).

Plaintiffs also contend that Congress first learned in 2016 of Customs' interpretation that only section 1677g interest would be distributed under the CDSOA in connection with the promulgation of the Trade Facilitation and Trade Enforcement Act. Pl. Br. at 29. However, like plaintiffs, the NPRM and the Final Rule published in the Federal Register provided notice of Customs' position. Federal Register publication of a document such as the Final Notice "is sufficient to give notice of the contents of the document to a person subject to or affected by it." *See* 44 U.S.C. § 1507. Given that Customs was implementing an act of Congress, it would have been a person affected by the Final Rule.

VII of the Deficit Reduction Act of 2005 (Public Law 109–171; 120 Stat. 154)), with respect to entries of merchandise that—
(1) were made on or before September 30, 2007; and
(2) were, in accordance with section 822 of the Claims Resolution Act of 2010 (19 U.S.C. 1675c note), unliquidated, not in litigation, and not under an order of liquidation from the Department of Commerce on December 8, 2010.

(c) **INTEREST DESCRIBED**
(1) **INTEREST REALIZED** Interest described in this subsection is interest earned on antidumping duties or countervailing duties described in subsection (b) **that is realized through application of a payment received on or after October 1, 2014**, by U.S. Customs and Border Protection under, or in connection with—
(A) **a customs bond** pursuant to a court order or judgment; or
(B) a settlement with respect to **a customs bond**, including any payment made to U.S. Customs and Border Protection with respect to that bond by a surety.
(2) **TYPES OF INTEREST** Interest described in paragraph (1) includes the following:
(A) Interest accrued under section 1677g of this title.
(B) Interest accrued under section 1505(d) of this title.
(C) Equitable interest under common law and interest under section 580 of this title awarded by a court against a surety under its bond for late payment of antidumping duties, countervailing duties, or interest described in subparagraph (A) or (B).

(d) **DEFINITIONS** In this section:
(1) **ANTIDUMPING DUTIES**
The term "antidumping duties" means antidumping duties imposed under section 1673 of this title or under the Antidumping Act, 1921 (title II of the Act of May 27, 1921; 42 Stat. 11, chapter 14).
(2) **COUNTERVAILING DUTIES**
The term "countervailing duties" means countervailing duties imposed under section 1671 of this title.

(Bold and underlined emphasis added).

Rather than requiring Customs to pay **all interest collected** on antidumping and countervailing duties such as section 1677g interest, delinquency interest under section 1505(d), statutory interest under 19 U.S.C. § 580, and court-ordered equitable interest, section 4401 limits this interest.  First, TFTEA only applies to interest realized through the application of payments

received by Customs on or after October 1, 2014.  19 U.S.C. § 4401(c)(1).  Further, TFTEA is limited to interest realized through the application of surety bond payments.  Nothing in TFTEA requires or authorizes delinquency interest received from a dilatory importer to be distributed to ADPs.

## ARGUMENT

A fair reading of the plain language of the CDSOA reveals that it unambiguously directs that only section 1677g interest, assessed at liquidation of an entry under an AD/CV duty order, be distributed to ADPs.  By speaking in terms of funds from assessed duties as being the source upon which interest would accrue, the CDSOA is referring to the duty amounts determined to be due at liquidation.  Only one type of statutory interest is assessed on antidumping and countervailing duties under the AD/CVD order at liquidation: section 1677g.  Delinquency interest under section 1505(d) can only come into play thirty days after liquidation, if and when a bill remains unpaid, and that delinquency interest accrues on the entire delinquent bill amount, including non-AD/CVD amounts.

We will demonstrate that the requirements of the CDSOA are clear.  However, should the Court view the statute as ambiguous, then, under Supreme Court precedent, the Court must defer to the agency's interpretation if it is reasonable.  Indeed, under the *Chevron* doctrine, an agency's "view governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Energy Corp. v. Riverkeeper, Inc.,* 556 U.S. 208, 218 (2009) (citing *Chevron*, 467 U.S. at 843-844) (emphasis in original); *see also Utility Air Regulatory Group v. E.P.A.*, 573 U.S. 302, 315 (2014).  For the reasons discussed below, Customs' interpretation of the CDSOA was reasonable and, therefore, the Court may not substitute its own construction of the statute for that of the agency.

## I.    STANDARD OF REVIEW

Plaintiffs commenced this action pursuant to 28 U.S.C. § 1581(i).  Compl. ¶ 3.  Pursuant

to section 1581(i), "the Court of International Trade shall review the matter as provided in

section 706 of title 5" (the Administrative Procedure Act (APA)).  28 U.S.C. § 2640(e).  In

making its determinations, "the court shall review the whole record or those parts of it cited by a

party, and due account shall be taken of the rule of prejudicial error."  5 U.S.C. § 706.  "The

scope of the court's review is confined to the record developed before the agency."  *Ammex Inc.*

*v. United States*, 341 F. Supp. 2d 1308, 1311 (Ct. Int'l Trade 2004) (citing *Camp v. Pitts*, 411

U.S. 138, 142 (1973)) *aff'd* 419 F.3d 1342 (Fed. Cir. 2005).

Under the APA, an agency final rule may be set aside if found to be "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A).  In reviewing regulations, the Court "applies the two-step analysis of *Chevron*

*U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81

L.Ed.2d 694 (1984)."  *DaimlerChrysler Corp. v. United States*, 361 F.3d 1378, 1381 (Fed. Cir.

2004).  As reflected in *Chevron*, if the intent of Congress is clear, that is the end of the matter;

"for the court, as well as the agency, must give effect to the unambiguously expressed intent of

Congress."  467 U.S. at 842-843.  However, "if the court determines Congress has not directly

addressed the precise question at issue, the court does not simply impose its own construction on

the statute, as it would in the absence of an administrative interpretation.  Rather, if the statute is

silent or ambiguous with respect to the specific issue, the question for the court is whether the

agency's answer is based on a permissible construction of the statute."  *Id.*

Indeed, the Supreme Court has "long recognized that considerable weight should be

accorded to an executive department's construction of a statutory scheme it is entrusted to

administer . . . ." *Id.* at 844.  Thus, an agency's statutory interpretation adopted through notice and comment is entitled to "controlling weight" so long as the interpretation is "reasonable in light of the legislature's revealed design."  *See United States v. Haggar Apparel Co*., 526 U.S. 380, 392 (1999) (citation and internal quotation marks omitted).

## II.   THE CDSOA UNAMBIGUOUSLY DIRECTS THAT ONLY DUTIES AND INTEREST PURSUANT TO 19 U.S.C. § 1677g ARE TO BE DISTRIBUTED

Plaintiffs challenge Customs' Final Rule, codified at 19 C.F.R. § 159.64(e), providing: "Therefore, no interest will accrue in these accounts.  However, statutory interest charged on antidumping and countervailing duties at liquidation will be transferred to the Special Account, when collected from the importer."  This rule is consistent with the plain language of 19 U.S.C. § 1675c.  As a result, the *Chevron* framework applies.  *See Chevron v. Nat. Res. Def. Council*, 467 U.S. 837 (1984).  Under *Chevron*, a court must determine whether Congress has "directly spoken to the precise question at issue." *Id*. at 842.  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*. at 842–843.  If Congress has not directly spoken to the issue, then the court must defer to the agency's interpretation if it is "reasonable." *Id*. at 844.

### A.  <u>The Plain Language Of The CDSOA</u>

"Absent a clearly expressed legislative intention to the contrary, [the statute's plain] language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc*., 447 U.S. 102, 108 (1980).  Further, the "whole-text canon" "calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts."  Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TESTS at 167 (2012); *see also Candle Corp. of Am. v. United States*, 374 F.3d 1087, 1093 (Fed. Cir. 2004) (a court "will not look merely to a particular clause in

which general words may be used but will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give it such a construction as will carry into execution the will of the Legislature.") (Citation omitted).

1. **The CDSOA only provides for the deposit and distribution of section 1677g interest**

The CDSOA speaks of interest twice:  "[t]he Commissioner shall deposit into the special accounts, all antidumping or countervailing duties (including interest earned on such duties) that are assessed [after October 1, 2000] under the antidumping order or finding or the countervailing duty order with respect to which the account was established," section 1675c(e)(2); and "[t]he Commissioner shall distribute all funds (including all interest earned on the funds) from assessed duties received in the preceding fiscal year," section 1675c(d)(3).  In both instances, duties and interest are modified by the word "assessed," which is critical to understanding congressional intent.  The use of the word "assessed" implicates a specific temporal event: liquidation.  *Norsk Hydro Canada, Inc. v. United States*, 472 F.2d 1347, 1359-60 (Fed. Cir. 2006) (equating "assessed" with "liquidated").  *See also* ARS143, 252, 414 ("Assessment occurs at liquidation"); ARS498 ("As explained in the notice of proposed rulemaking, the assessment of duties on an import entry is accomplished by liquidating the subject entry").  Liquidation is defined as the "final computation or ascertainment of duties" on entries.  19 C.F.R. § 159.1.

The only type of interest that is assessed on AD/CV duties at liquidation is 19 U.S.C. § 1677g interest.  This is significant because section 1675c(e)(2) instructs Customs to "deposit into the special accounts, ***all antidumping and countervailing duties (including interest earned on such duties) that are assessed***" under the applicable AD/CV findings or orders.  (Emphasis

added).[4]  Similarly, section 1675c(d)(3) instructs Customs to "***distribute all funds (including all interest earned on the funds) from assessed duties*** received in the preceding fiscal year . . ."

Thus, the interest deposited into the special accounts and made available for distribution to ADPs is limited to that interest earned on the assessed AD/CV duties at liquidation.  At the time of assessment, *i.e.*, liquidation, interest is calculated and payable for both overpayments and underpayments of amounts deposited on merchandise subject to AD/CV duties as provided by section 1677g.

Furthermore, this position is bolstered by the statutory language of the CDSOA specifying that the distributable assessment occurs "under" the AD/CV duty order.  Specifically, 1675c(e)(2) specifies that the deposits into the special account are all AD/CV duties (including interest earned on such duties) "that are assessed . . . **under the antidumping order or finding or the countervailing duty order** with respect to which the account was established." (Emphasis added).  The only type of interest assessed "under" Commerce's AD/CV duty order is 1677g interest.  The Tariff Act of 1930 provides that the duties and the 1677g interest owed, if any, must be assessed by CBP at liquidation as part of the AD/CV duty assessment.  19 U.S.C. §§ 1671f(b), 1673f(b) (the AD/CV duties owed under Commerce's order "shall be . . . collected . . . together with interest as provided by [19 U.S.C. § 1677g]").  The 1677g interest only accrues on the AD/CV duties, and it never accrues on any ordinary consumption duties, taxes, or fees. *See* 19 U.S.C. § 1677g (identifying only one circumstance under which 1677g interest accrues— underpayments or overpayments of AD/CV duty deposits).  In order for 1677g interest to accrue, Commerce's AD/CV duty order must be in place.  If an entry is made before Commerce has

---

[4] The AD/CV duties and interest deposited into the special accounts pursuant to section 1675c(e)(2) are the only source of the funds for the distributions for the ADPs.  *See* 19 U.S.C. § 1675c(e)(3) (". . . the Commissioner shall by regulation prescribe the time and manner in which *distribution of the funds in a special account shall be made*.") (Emphasis added).

issued the relevant AD/CV duty order for the merchandise at issue, then no 1677g interest will

be assessed.  19 U.S.C. § 1677g (interest shall be payable on amounts entered "on and after . . .

the date of publication of a countervailing or antidumping duty order under this title . . ."); *see*

*Am. Hi-Fi Int'l, Inc. v. United States*, 936 F. Supp. 1032, 1039-40 (Ct. Int'l Trade 1996) ("once a

duty order issues from Commerce [section 1677g] interest begins to accrue").  Thus, section

1677g interest is entirely dependent upon the issuance of Commerce's order and the ultimate

AD/CV duty assessment that occurs at liquidation under that order.[5]

In contrast, section 1505(d) interest only arises – if at all – after liquidation, when "duties,

fees, and interest determined to be due or refunded are not paid in full within [a] 30-day period,"

which includes any non-AD/CVD amounts.  Section 1505(d) interest accrues any time a

delinquent bill remains unpaid, without regard to when Commerce's AD/CV duty order was

issued and even in the absence of an AD/CV duty order by Commerce.  Delinquency interest is

not assessed at liquidation and accrues on amounts that include non-AD/CV duties.  Thus,

section 1505(d) interest is not "earned on" the AD/CV duties at liquidation and does not fall

within the CDSOA's plain language.  Indeed, by the plain terms of the CDSOA, Customs is

---

[5] Moreover, Congress's use of parenthesis in subsection (e)(2) further reinforces that only section 1677g interest is subject to deposit into the special account for CDSOA distribution.  Under common grammar, a parenthetical is used to explain the term immediately preceding it, and the contents of the parenthetical serve as mere illustrations or examples of that term.  *See*, *i.e.*, *Chickasaw Nation v. United States*, 534 U.S. 84, 89-90 (2001) (explaining that the use of a parenthetical emphasized that the words within the parenthetical were "meant simply to be illustrative, hence redundant" of the term preceding the parenthetical).  When Congress wrote in a parenthetical following the term AD/CV duties: "(including interest earned on such duties)," Congress was logically referencing the type of interest that is part of the AD/CV duty assessment.  Plaintiffs ignore Congress' use of the parenthesis and ask this Court to construe the parenthetical as referring to interest that is separate from the duty assessment under the AD/CVD order that occurs at liquidation.  This would render the parenthetical structure meaningless.

authorized and required to deposit only the AD/CV duties and associated interest assessed at liquidation – 1677g interest – for distribution to the ADPs.

Plaintiffs claim that the CDSOA unambiguously requires Customs to "deposit" and to "distribute" "all interest," including delinquency interest, to ADPs.  Pl. Br. at 18, 21.  Had Congress instructed Customs using such language, then there would have been no question that Congress intended for section 1505(d) delinquency interest to be deposited into the special accounts and distributed to ADPs.  This argument lacks textual support because the statute makes no such explicit statement.  Instead, "all interest" means that Customs should distribute all 1677g interest and should not deduct any amount to cover 1677g interest the government pays to importers when the final AD/CV duty rate is lower than the deposit rate and the importer receives a refund.  The Senators who participated in the notice-and-comment rulemaking, including Senator Byrd, appear to have shared this same view and approved of Customs' treatment of interest, stating in their comment: "[W]e appreciate the fact that you intend to distribute pursuant to the Act the full amount of assessed antidumping and countervailing duties, including interest paid by the importer at final liquidation but without any adjustment for interest remitted to the importer.  In our view any other construction of the Act would significantly undermine its purpose."  ARS391.  For the reasons discussed above, the express language of the CDSOA rejects plaintiffs' position.

## 2. Statutes should be construed contextually, not by parsing words or clauses

Plaintiffs fail to follow the binding authority they cite that requires consideration of the entire statute's text and structure.  Pl. Br. at 20-21, 25 (citing, among others, *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399 (2012) (noting that "[t]he meaning of a phrase turns on its context.")).  Instead of construing the CDSOA's interest issue from a holistic,

contextual approach, plaintiffs parse the statute's language to obtain the result they desire.  For example, plaintiffs latch onto the word "from" in section 1675c(d)(3) to argue that "funds" must include section 1505(d) interest because delinquency interest accrues on the outstanding balance of assessed duties.  Pl. Br. at 24.  By parsing this provision word by word, plaintiffs' "but for" statutory analysis finds no support in judicial authority and does violence to the textual meaning of the statute.  As discussed above, in the context of the CDSOA, the "funds" to be distributed are the assessed (liquidated) AD/CV duties and 1677g interest, *i.e.*, interest earned due to underpayments of AD/CV duty deposits, nothing else.

Next, to the detriment of the whole-text canon, plaintiffs elevate the word "all" present in section 1675c(d)(3),[6] claiming that "all interest" "refers to multiple kinds of interest."[7]  Pl. Br. at 21-23, 25-26.  For the term "all" used in a statute to mean every kind of a particular thing, the statute must not contain language contextually providing for qualifications or limitations.  The cases plaintiffs cite in support of this argument make this very point.  *See Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991) (although the decision provides "the phrase 'all other law' indicates no limitation," contextually it is limited to law); *Gardner v. State of N.J.*, 329 U.S. 565, 573 (1947) (although the decision provides "The words 'all holders of claims' have no qualification and are sufficiently broad to include public agencies as well as private parties," it is limited to holders who have properly filed claims); *SciMed Life Sys., Inc. v.*

---

[6] Section 1675c(d)(3) provides: "The Commissioner shall distribute all funds (including all interest earned on the funds) from assessed duties received in the preceding fiscal year to affected domestic producers based on the certifications described in paragraph (2).  The distributions shall be made on a pro rata basis based on new and remaining qualifying expenditures."

[7] Under plaintiffs' theory that all interest means all interest to the extreme, interest payable to an importer due to an overpayment of deposited amounts of AD/CV duties would be interest earned on the funds and should be distributed to them rather than returned to the importer.  This incongruous result further illustrates why the Government's analysis of the statute is correct.

*Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001) (although the decision provides that "'all embodiments of the present invention' are broad and unequivocal," contextually it is limited to the present invention).

As shown above, the terms of the CDSOA limit "all funds" for distribution to those from assessed/liquidated AD/CV duties, and "all interest" to the interest earned on AD/CV duties at liquidation.  The word "all" indicates that no deduction from the Special Account should occur for interest paid to the importer when the final AD/CV duty rate is lower than the deposit rate and the importer receives a refund of deposited duties plus 1677g interest. Thus, plaintiffs' construction of section 1675c(d)(3) contravenes Supreme Court authority explaining that statutory construction is a "holistic endeavor" that discourages parsing words or phrases and ignoring context.  *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988).

### 3.  The Final Rule gives effect to Congress' statutory scheme and the terms of the statute

Plaintiffs assert that the Government's analysis of "all interest" is contrary to the language, structure, and context of the CDSOA.  Pl. Br. at 23-25.  For the reasons discussed above, II.A.1, 2, the Government's construction of the plain language of the CDSOA takes into consideration and gives effect to all the language used in sections 1675c(d)(3), (e)(2).

As plaintiffs acknowledge, when construing a statute "courts must read statutes in light of 'the language and design of the statute as a whole." Pl. Br at 25 (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).  Significantly, the structure of the CDSOA opens with the general statement that "[d]uties assessed pursuant to a countervailing duty order, an antidumping order, or a finding under the Antidumping Act of 1921 shall be distributed on an annual basis under this section to the affected domestic producers for qualifying expenditures."  Thus, the

21

purpose of this statute is to distribute AD/CV duties to ADPs rather than to the general fund of the U.S. Treasury.  Consistent with this purpose, if the AD/CV duties deposited with Customs are underpaid, then the section 1677g interest assessed at liquidation compensates the ADP for the underpayment of the AD/CV duties.  Therefore, limiting CDSOA interest to section 1677g interest gives effect to the entire statute.

Also, the two provisions addressing interest in the CDSOA ("Distribution of funds" and "Deposits into accounts") are only squared under the Government's analysis of the interest language.  Notably, Congress did not say "including all interest" when it described the type of interest to be deposited into the CDSOA special accounts.  19 U.S.C. § 1675c(e)(2).  Rather, Congress described the deposit of "all antidumping or countervailing duties" assessed under the AD/CV orders, including the deposit of "interest earned on such duties."  This distinction is meaningful because Congress **did** say "including all interest earned on the funds" when it described the distributions to be made to the ADPs from the special accounts.  19 U.S.C. § 1675c(d)(3).  In other words, Congress knew how to say "including all interest" when it so intended.

Therefore, sections 1675c(d)(3) and (e)(2) must be reconciled.  In accordance with their plain meaning, the provisions are reconciled by viewing section 1675c(e)(2) as requiring Customs to deposit of all AD/CV duties and 1677g interest collected in a given fiscal year into the CDSOA special accounts and viewing the "including all interest" language in section 1675c(d)(3) to mean that Customs was required to distribute all of the funds in the special accounts to the ADPs, including all of the section 1677g interest, without any deduction from the special accounts for the 1677g interest paid to importers for excess AD/CV duty deposits.  This is the construction of the statutory language that Customs provided for in its notice-and-comment

22

rulemaking.  ARS130-131, 133-134 (NPRM); ARS497, 501 (Final Rule).  Indeed, this is the

same conclusion reached by several public commenters regarding the CDSOA's treatment of

interest, including Senator Byrd.  *See* ARS144, 232, 240, 252, 347, 352, 391, and 414.  Any

other interpretation undermines the structure of the statute and should be avoided.

> **4.  Congress' findings and legislative history regarding the CDSOA do not support an interpretation that "all interest" includes section 1505(d) interest**

As we have shown above, the language used by Congress in promulgating the CDSOA

does not support the inclusion of section 1505(d) interest in distributions.  In an effort to

overcome the statute's language, plaintiffs turn to a set of findings issued by Congress when

enacting the CDSOA.  Pl. Br. at 27.  The findings are:

> (1) Consistent with the rights of the United States under the World Trade Organization, injurious dumping is to be condemned and actionable subsidies which cause injury to domestic industries must be effectively neutralized.
> (2) United States unfair trade laws have as their purpose the restoration of conditions of fair trade so that jobs and investment that should be in the United States are not lost through the false market signals.
> (3) The continued dumping or subsidization of imported products after the issuance of antidumping orders or findings or countervailing duty orders can frustrate the remedial purpose of the laws by preventing market prices from returning to fair levels.
> (4) Where dumping or subsidization continues, domestic producers will be reluctant to reinvest or rehire and may be unable to maintain pension and health care benefits that conditions of fair trade would permit. Similarly, small businesses and American farmers and ranchers may be unable to pay down accumulated debt, to obtain working capital, or to otherwise remain viable.
> (5) United States trade laws should be strengthened to see that the remedial purpose of those laws is achieved.

Plaintiffs strain to suggest that section 1505(d) interest is lurking *sub silencio* in the

findings of Congress.  Pl. Br. at 28.  Plaintiffs are wrong.  The congressional findings simply

explain that the CDSOA is "[i]ntended to strengthen the remedial purposes of the antidumping

and countervailing duty laws" and to explain the change of the long-standing use of AD/CV duty proceeds for general government expenses to providing these duties to affected domestic producers to help them remain viable. *See Southern Shrimp Alliance v. United States*, 617 F. Supp. 2d 1334, 1340 (Ct. Int'l Trade 2009).

Indeed, it is the assessment of the AD/CV duties that levels the playing field. The distribution of AD/CV duties and section 1677g interest provides funds that domestic producers can use to reinvest or rehire. Distributing delinquency interest in addition to the AD/CV duties and section 1677g interest would essentially serve as treble compensation, which Congress did not evidence as its intent.[8]

Moreover, the legislative history[9] cited by plaintiffs' undercuts their position. *See* Pl. Br. at 28. The floor comments made concerning the predecessor bill for the CDSOA do not mention the word interest, let alone delinquency interest. *Id.* These comments include: "duties and fines would be transferred to injured U.S. companies," and "reduce the adverse effect of continued dumping or subsidization by distributing the monies finally assessed to the injured industry." Interest is not a fine. And, consistent with section 159.64(e), "monies finally assessed" are the monies calculated at liquidation under the AD/CV duty order. The Senators who participated in

---

[8] Public commenters during the notice-and-comment process for the CDSOA regulations expressed opposition on a similar basis. *See*, *i.e.*, ARS141 ("[AD/CV] duties are intended to level the playing field between the imports in question and the domestic industry. This level playing field is destroyed if the domestic industry is allowed to receive the proceeds of the duty. The Byrd Amendment provides an additional motive for U.S. producers to file [AD/CVD] petitions, even in the most dubious of circumstances. The twin temptation of a duty margin and a financial windfall from the transferred duties will provide a powerful incentive to do so."); ARS 287 ("the CDSOA amounts to a market-distorting subsidy to petitioning companies that may have no need of the funds"); ARS 243-250.

[9] "[T]he use of legislative history poses a major theoretical problem: It assumes that what we are looking for is the intent of the legislature rather than the meaning of the statutory text." Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TESTS at 375 (2012).

the notice-and-comment rulemaking, including Senator Byrd, likewise viewed Customs'
treatment of interest in section 159.64(e) as consistent with the statute's purpose. *See* ARS391.
The omission of "interest" from the congressional discussions reveals an intent not to distribute
section 1505(d) interest.

Finally, plaintiffs point to floor comments from 2016 to argue that "[d]uties collected on
dumped imports and all interest on those duties from 2000 to 2007 were intended to be paid,"
and TFTEA was enacted to "correct CBP's misreading of the law." Pl. Br. at 29. These
comments fall within the legislative history of TFTEA, not the legislative history of the CDSOA.
Moreover, as discussed above, TFTEA does not support plaintiffs' interpretation either, because
even its distribution of section 1505(d) interest is limited to collections from sureties received by
Customs on or after October 1, 2014. TFTEA does not distribute section 1505(d) interest for
importer payments or payments received prior to 2014, meaning Congress again did not evidence
an intent to distribute section 1505(d) delinquency interest expansively like plaintiffs propose
dating back to the CDSOA's inception.

## III. EVEN IF THE CDSOA IS AMBIGUOUS AS TO WHAT INTEREST SHOULD BE DISTRIBUTED, CUSTOMS FINAL RULE REASONABLY INTERPRETED 19 U.S.C. § 1675c AND IS ENTITLED TO *CHEVRON* DEFERENCE

As we established in Part II, the terms of the CDSOA are not ambiguous and the Final
Rule, codified at 19 C.F.R. §§ 159.61-159.64, properly construed the meaning of depositing into
the special accounts "all antidumping or countervailing duties (including interest earned on such
duties) that are assessed after [October 1, 2000] under the antidumping order or finding or the
countervailing duty order" and distributing from the special accounts "all funds (including all
interest earned on the funds) from assessed duties." As a result, there is no need to resort to the
second step of *Chevron*. *See* 467 U.S. at 842-44.

However, if the Court concludes that the CDSOA's provisions addressing interest render the statute ambiguous, then the Court must determine "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. In making this determination "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question had arisen in a judicial proceeding." *Id.* at 843 n.11. Instead, agency "regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844. Finally, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.*

## A. Distributing Only Section 1677g Interest To ADPs Is Reasonable And Supports Congress' Purpose

According to Congress, the purpose of the CDSOA was to strengthen trade laws to achieve their remedial purpose by restoring conditions of fair trade and avoiding job losses and investment in the United States that could be lost through false market signals caused by continued antidumping or subsidization. Pub. L. 106-387, § 1(a) [title X, § 1002], Oct. 28, 2000, 114 Stat. 1549, 1549A-72. To that end, the CDSOA expressly called for the distribution of AD/CV duties to be transferred from the general fund of the U.S. Treasury to ADPs.

The regulations enacted by Customs fulfill this purpose. As we discuss above, the CDSOA calls for the deposit and distribution of assessed AD/CV duties and the interest earned on those duties at liquidation under the AD/CVD order. Section 1677g is the statutory provision that provides for interest to be earned on the AD/CV duties at liquidation under the AD/CV orders. Given the specificity of the statutory language and the terms of art in the AD/CV laws, Customs reasonably interpreted the statute to require the deposit and distribution of only section

26

1677g interest, a statutory interest provision dedicated to AD/CV duties.  The reasonableness of the Final Rule is not thwarted by language in section 1675c(d)(3) regarding the distribution of "all interest" in the special account.  Indeed, noticeably missing from the statute is the kind of language calling for distribution of section 1505(d) interest such as that used in TFTEA's "TYPES OF INTEREST" section, which itemizes the interest contemplated.  This is logical because the CDSOA is not contemplating *unpaid* AD/CV duties, it is transferring paid AD/CV duties and section 1677g interest to ADPs.  As detailed above, the presence of "all interest" in the statutory language means that Customs is not to deduct section 1677g interest paid to importers on refunds of duty deposits from the Special Account when the final AD/CV duty rate is lower than the deposit rate.

### B.  Congress Delegated To Customs The Authority To Administer the CDSOA

"'The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.'"  *Chevron*, 467 U.S. at 843 (quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)).   The Supreme Court recognizes that a legislative delegation may be implicit rather than explicit.  *Chevron*, 467 U.S. at 844.  "In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."  *Id.*

Plaintiffs argue that the authority delegated by Congress to Customs did not include the ability to omit delinquency interest.  Pl. Br. at 36.  Plaintiffs' position suffers from an incomplete review of the CDSOA and is based on their erroneous reading that "all interest" includes "delinquency interest."  The CDSOA provides that "[t]he Commissioner shall prescribe procedures for distribution of the continued dumping or subsidies offset required by this

27

section."  Section 1675c(c).  It further provides that "[c]onsistent with the requirements of subsections (c) and (d) of this section, the Commissioner shall by regulation prescribe the time and manner in which distributions of the funds in a special account shall be made."  Section 1675c(e)(3).  As explained above, Customs' regulations administering the CDSOA are consistent with the statutory language.

### C. The Existence Of An Introductory Discussion (Preamble) To Customs' Final Rule That Provides Clarity To Customs' Rulemaking Does Not Preclude Deference To Those Rules

Plaintiffs' contention that Customs is only authorized to act by regulation, which does not include decisions articulated only in a preamble, similarly misses the mark.  Pl. Br. at 34.  As discussed above, the CDSOA only permits the deposit and distribution of AD/CV duties and 1677g interest.  Therefore, Customs' regulation is not at issue because it is consistent with the plain language of the statute.  However, to the extent an ambiguity exists concerning what interest is subject to deposit and distribution, CBP filled that gap with its regulation, not the preamble.  Specifically, 19 C.F.R. § 159.64(e) states:

> (e) Interest on Special Accounts and Clearing Accounts. In accordance with Federal appropriations law, and Treasury guidelines on Special Accounts, funds in such accounts are not interest-bearing unless specified by Congress. Likewise, funds being held in Clearing Accounts are not interest-bearing unless specified by Congress. Therefore, no interest will accrue in these accounts. However, **statutory interest charged on antidumping and countervailing duties at liquidation will be transferred to the Special Account, when collected from the importer.**

(Emphasis added).  This language expressly identifies that section 1677g interest will be deposited and distributed.  As the Court recognized in its earlier decision, "19 C.F.R. § 159.64(e) implies, but does not expressly state, that other types of interest (such as delinquency interest) will not be placed into the special accounts."  *American Drew,* 450 F. Supp. 3d at 1385.  The preamble clarifies the meaning of this regulation—that only 1677g interest will be distributed.

28

*See id.* (explaining how the preamble clarifies the agency's decision that no type of interest other than Section 1677g interest would be deposited into the special accounts for distribution to ADPs.)  The fact that the preamble provided further clarity regarding the meaning of the regulation does not undermine this.  Preambles frequently provide explanation and clarity.

Additionally, by its terms, the CDSOA confers on Customs the authority to construe subsections (c) and (d) in order to promulgate regulations consistent with those provisions. Moreover, subsection (c) necessitates that Customs determine what is required by the CDSOA. Thus, consistent with *Chevron*, CBP's regulation, which was subject to notice and comment, should be afforded deference to the extent an ambiguity exists in the statute.

Plaintiffs appear to conflate adequate notice that Customs would not distribute section 1505(d) delinquency interest, thereby rendering time-barred any claims arising before April 18, 2015, with deference to the regulation itself.  Pl. Br. at 34-39.  The Government does not claim that the preamble in the Final Rule is a regulation entitled to deference.  Rather, we show that the regulation itself is entitled to deference.

In promulgating its section 159.64(e) regulation, Customs expressly revealed its interpretation that the CDSOA called for the distribution of "statutory interest charged on antidumping and countervailing duties at liquidation."  The inclusion of "at liquidation" limits such interest to section 1677g interest and does not extend to section 1505(d) interest, which can only come into existence, if at all, after liquidation, when a bill remains unpaid for more than 30 days.  Under the interpretive cannon, *expressio unius est exclusio alterius* (expressing one item of an associated group or series excludes another left unmentioned), section 159.64(e) excludes delinquency interest from distribution.  Thus, the regulation unambiguously provides only for distribution of section 1677g interest.  However, to the extent an ADP was confused about

29

whether this regulation also provided for the distribution of delinquency interest, the preamble to the Final Rule provided confirmation that it did not, thereby providing adequate notice that section 1505(d) interest would not be distributed.

Plaintiffs' position that the preamble in the Final Rule is not entitled to *Chevron* deference is irrelevant. Pl. Br. at 36-49. The effect of the preamble was to provide plaintiffs with adequate notice that section 1505(d) interest would not be distributed under the CDSOA. Thus, in light of this notice, any claims of plaintiffs challenging the regulation are time-barred for any distributions made prior to April 18, 2015. *American Drew*, 450 F. Supp. 3d at 1388-89. Thus, Customs' interpretation of the CDSOA as not allowing for distribution of section 1505(d) interest could not "create[] an unfair surprise to regulated parties." *See* Pl. Br. at 47.

Further, contrary to plaintiffs' arguments, the administrative record does not reflect that the Final Rule constituted "a 180-degree departure from both the statute and the proposed rule." Pl. Br. 47-48. Rather, the record shows that the unexpected inclusion of the CDSOA in the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act required Customs to act quickly to review the legislation and draft proposed implementing regulations. By November 16, 2000, Customs held its first meeting of the Customs Task Force. ARS504-507. As reflected in the administrative record, the Customs Task Force started from numerous positions concerning CDSOA distributions that were vastly different from the actual position adopted at the time of the NPRM. *Compare* ARS506-507 at ¶ 4 (contemplating periodic distributions to ADPs made monthly, bi-monthly or quarterly) *with* ARS134 (NPRM providing for annual distributions to ADPs in proposed regulation 159.64(b)(1)); *compare* ARS507 (contemplating distributions of liquidated amounts of AD/CV duties, without respect to whether those funds had actually been collected by Customs) *with*

30

ARS134 (NPRM providing for distributions of only assessed AD/CV duties actually received/collected by Customs in proposed regulation 159.64(b)(1)).

Additionally, Customs initially contemplated paying interest on the funds in the special account and thought the statutory language referencing "all interest earned on the funds" was an indication that the special account was interest bearing.  ARS506 at ¶ 3.  As reflected in the NPRM, Customs determined that these were not interest bearing accounts.  Also, in December 2000, it was the Task Force's position that Customs would not be responsible for verification of certifications by ADPs and that any ADPs with a dispute needed to work it out among themselves in a civil proceeding.  ARS18 at ¶ 4.  Ultimately, as seen in the NPRM, Customs determined that it had authority to perform verifications.  ARS133 (proposed regulation 159.63(d) providing for verifications of certifications).

By February 21, 2001, Customs intended to distribute 1677g interest (ARS511 at ¶11) and temporarily considered distributing section 1505(d) interest.  ARS511 at ¶ 10 ("OF and OIT will consider possible methods for assigning 1505 interest to specific AD/CV cases for purposes of deposit into the Clearing Account and eventual transfer into the Special Account for disbursement.").  Like interest accruing on the special accounts, whether to distribute both section 1677g and section 1505(d) interest was under informal consideration in February 2001. By May 2001, a draft Federal Register Notice indicated that interest charged "at liquidation," *i.e.*, section 1677g interest, would be distributed.  ARS116.  A draft CDSOA implementation plan dated May 29, 2011, ARS529-536, provides that "[o]nly liquidated amounts associated with each case qualify for distribution."  ARS 531.  Noticeably missing from this document is any discussion of distributing section 1505(d) interest.  Contrary to plaintiffs' position, by the time the NPRM was published in June 2001, Customs did not intend for section 159.64(e) to

distribute section 1505(d) interest.  This point was conveyed by the proposed rule ("statutory interest charged on antidumping and countervailing duties at liquidation, will be transferred to the Clearing Account or Special Account, as appropriate, when collected from the importer"), ARS134, the NPRM's preamble ("if there is interest paid by the importer on any antidumping or countervailing duties billed in the liquidation process for the import entries, that interest will be transferred to the Clearing Account or Special Account"; illustration 2 regarding liquidations that bill for additional AD/CV duties and interest), ARS130-131, and the absence of any reference to post-liquidation section 1505(d) interest in the NPRM.  ARS128-134

Nevertheless, for the reasons discussed in Part II above, the preamble to the Final Rule correctly states that "only" section 1677g interest would be distributed under the CDSOA.  As such, it is also entitled to deference.

### D.  The Final Rule Distributing Only Section 1677g Interest Is Not Arbitrary Or Capricious And Is Entitled To *Chevron* Deference

As explained above, the plain language of the CDSOA provides that only duties and the 1677g interest that is part of the duty assessment are subject to CDSOA distribution.  Based on this language, Customs' decision to only include section 1677g interest in CDSOA distributions was not arbitrary or capricious.  However, if the Court determines that the statutory language is ambiguous, then Customs' interpretation of the term "interest" should be given deference.

The Supreme Court has "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron*, 467 U.S. at 844.  "[T]he principle of deference to administrative interpretations has been consistently followed by [the Supreme] Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge

respecting the matters subjected to agency regulations." *Id.* So long as it is not contrary to Congress's intent, the Court must uphold the agency's determination, even if there are other permissible interpretations the agency could have reached and even if the Court would have otherwise reached a different interpretation. *Id.* at 843 n.11. Indeed, "whether or not they enjoy any express delegation of authority on a particular question, agencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered." *United States v. Mead Corp.,* 533 U.S. 218, 227 (2001).

In *Smiley v. Citibank*, 517 U.S. 735 (1996), the Supreme Court considered whether deference should be given to a federal agency's interpretation of the word "interest" in a provision of the National Bank Act of 1864 that authorized national banks to charge their loan customers "interest at the rate allowed by the laws of the State . . . where the bank is located." 517 U.S. at 737. The petitioner, a loan customer, argued that this provision of the National Bank Act did not apply because the fixed-fee late payment charge at issue did not constitute "interest." *Id.* at 743. In response to the customer's lawsuit and another lawsuit, the Office of the Comptroller of the Currency (part of the U.S. Department of Treasury) issued a regulation stating that the term "interest" in the National Bank Act included late payment fees. *Id.* at 739-40.

The loan customer argued that this position was not entitled to deference, but the Court disagreed explaining:

> We accord deference to agencies under *Chevron*, not because of a presumption that they drafted the provisions in question, or were present at the hearings, or spoke to the principal sponsors; but rather because of a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows.

33

*Smiley*, 517 U.S. at 740-41.  The Court ultimately deferred to the interpretation of the agency that the term "interest" included fixed-fee late payment penalties and affirmed the dismissal of the customer's complaint.  *Id.* at 747.

Likewise, here, if the Court concludes that the CDSOA is ambiguous regarding the definition of "interest," then the Court should defer to Customs' view—promulgated through notice-and-comment rulemaking—that the term "interest" in the CDSOA means section 1677g interest.  Therefore, any ambiguity left by Congress concerning the meaning of the term "interest" was left with the understanding that CBP, the implementing agency, should use its discretion to resolve it.  *See Smiley*, 517 U.S. at 740-41 ("Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows").  CBP's interpretation of the CDSOA is a well-founded, reasonable interpretation of the statutory language, and is entitled to *Chevron* deference.

As reflected in the record, Customs automated system could not identify section 1505(d) on a line item basis in an entry and, therefore, was unable to attribute such interest, if any, to CDSOA-eligible items in an entry.  Thus, the circumstances here particularly warrant deference given that plaintiff's preferred interpretation of the statute would render the Government incapable of complying with the statutory requirements—a policy consideration that is beyond "ordinary knowledge" and instead rests solely within the knowledge and purview of CBP's expertise.  *See Chevron*, 467 U.S. at 843-44 (deference to agency interpretations "has been consistently followed . . . whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the  force of the statutory policy in

34

the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations").  Thus, the Court should uphold CBP's determination concerning the meaning of the term "interest" under the CDSOA even if there are other permissible interpretations the agency could have reached and even if the Court would have otherwise reached a different interpretation.  *See Chevron*, 467 U.S. at 843 n.11 ("[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted . . . or even the reading the court would have reached" so long as it is not contrary to the statute.  Furthermore, the Court previously deferred to CBP's interpretation of the CDSOA in *Southern Shrimp Alliance v. United States*, 617 F. Supp. 2d 1334 (Ct. Int'l Trade 2009).

In *Southern Shrimp Alliance*, the Court considered several claims in which Customs' interpretation of the CDSOA was at stake, and repeatedly deferred to the agency's understanding.  For example, in one claim the plaintiffs challenged CBP's interpretation of 19 U.S.C. § 1675c(b), which Customs interpreted as allowing the purchase of imported shrimp to count as a "qualifying expenditure."  *Southern Shrimp Alliance*, 617 F. Supp. 2d at 1344.  The plaintiffs argued that counting such a purchase as a qualifying expenditure would frustrate the purpose of the CDSOA by subsidizing the purchase of foreign-produced shrimp to the detriment of domestic ADP shrimp farmers.  *Id.*  The Court resolved the claim in favor of CBP by relying on a CBP Ruling Letter from a prior case in which CBP rejected an argument that was virtually identical to the one made by the *Southern Shrimp Alliance* plaintiffs.[10]  *Id.*  The Court held that although Customs' Ruling Letters are not entitled to *Chevron* deference, the letter's "thoroughness, logic, and expertness" provided a persuasive interpretation of the CDSOA

---

[10] The Ruling Letter, referred to as the "Honey Ruling," rejected the contention by ADP beekeepers and ADP beekeeper packers that other ADPs were precluded from claiming the cost of purchasing foreign honey as a qualified expenditure under § 1675c(b).  *Southern Shrimp Alliance*, 617 F. Supp. 2d at 1344.

35

provision that, under *Skidmore*, was worthy of deference.  *Id.* at 1345 (citing *Skidmore v. Swift & Co.*, 232 U.S. 134, 140 (1944)).  The Court concluded that CBP did not act contrary to law by accepting the ADPs' expenditures for the acquisition cost of imported shrimp, and dismissed the plaintiffs' claim.  *Id.*

In another claim, the *Southern Shrimp Alliance* plaintiffs alleged that CBP "unlawfully refused to distribute" CDSOA funds collected from overpayments in accordance with the *pro rata* distribution calculation for the fiscal year in which duties were originally collected, as allegedly required under 19 U.S.C. § 1675c(d)(3).  *Id.* at 1348.  CBP had interpreted section 1675c(d)(3) to mean that overpayments were to be distributed in accordance with the *pro rata* calculation for the fiscal year in which the overpayments were *recovered*.  *Id.*  After determining that the statutory language at issue was not "plain and unambiguous," the Court again resolved the claim in CBP's favor—this time relying on a more informal interpretation letter that CBP issued in a prior case.  *Id.*  In the earlier letter, CBP rejected the very same argument that the *Southern Shrimp Alliance* plaintiffs were advancing in the Court, and explained that "when [CBP] recovers overpayments, these funds become available for *pro rata* distributions in the Fiscal Year in which they are recovered."  *Id.*  The Court found CBP's interpretation and application of § 1675c(d)(3) reasonable for two reasons: first, it "furthered the statutory requirement that funds be distributed only to ADPs that remain in operation;" and second, CBP's policy "reasonably promoted agency efficiency with a concomitant reduction in an ADP's burden of submitting paperwork."  *Id.* at 1348-1349.  The Court concluded that CBP's informal interpretation was entitled to some degree of deference, and dismissed the plaintiffs' claim.  *Id.* at 1349.

As plaintiffs acknowledge, there are documents in the record reflecting that Customs did not believe it was capable of accurately identifying the delinquency interest associated with CDSOA-subject collections.  Pl. Br. at 12.  A consideration of technological limitations as a reason for a regulation is not improper.  Indeed, courts have upheld agency actions on the basis of administrative burdens or limitations.  *See Armour v. City of Indianapolis*, 566 U.S. 673 (2012) (change in city's sewer-project funding method which forgave future installment assessments but provided no refunds for prepaid assessments had a rational basis because maintaining an administrative system to continue collection of installment assessments in addition to the new funding method could have proven to be complex and expensive, and providing refunds for prepaid assessments would have added additional administrative costs of processing and funding the refunds); *Pakfood Pub. Co. v. United States,* 753 F. Supp. 2d 1334 ("Administrative convenience of the government constitutes a reasonable and rational basis for agency action.") (citing *Consol. Edison Co. of N.Y., Inc. v. Abraham*, 314 F.3d 1299, 1304 (Fed. Cir. 2002) (*per curiam*) (holding that administrative convenience constitutes "a reasonable and rational basis" for agency action)).

That Customs did not provide the public with an in-depth discussion of the agency's technological limitations in the notice and comment process is of no moment.  This is not akin to a scenario where the agency is choosing between competing policy choices and public discourse could elucidate the analysis.  Rather, the agency is in the best position to evaluate and consider what it is technologically capable of doing.  Because the agency's technical capabilities fall solely within the agency's experience and expertise, there was no reason for Customs to include a detailed discussion of its technology as part of the notice and comment process.

Moreover, the fact that technological limitations were present does not mean that there is no statutory support for Customs' interpretation.  Quite the opposite, as set out above, the statutory language expressly permits *only* duties and 1677g interest to be distributed.  Nor is this legal justification pretextual as plaintiffs suggest.  Pl. Br. at 43.  Statutory interpretations are a question of law.  A party's version of the facts or alleged reason for doing something may be pretextual, but a question of law cannot be pretextual.  The agency's analysis of the statutory language is either in accordance with the law or it is not.

Plaintiffs' invitation to conduct a *de novo* review of the statute should be rejected.  Pl. Br. at 49-50.  As discussed above, Customs' interpretation is embodied in a regulation that went through the notice and comment process.  To the extent the Court determines that there is an ambiguity in the statute, the agency's Final Rule is entitled to *Chevron* deference.

## IV.    PLAINTIFFS' REQUEST FOR RECONSIDERATION SHOULD BE DENIED

Pursuant to CIT Rule 54(b), plaintiffs request that the Court reconsider its decision that their claims for CDSOA distributions received prior to April 18, 2015 are time-barred.  Pl. Br. at 50-51.  Because the Court has issued an opinion in connection with this action, the doctrine of "law of the case" is implicated. The law of the case doctrine encompasses issues expressly decided or "decided by necessary implication." *United States v. White*, 846 F.2d 678, 684 (11th Cir. 1988); *see also Ford Motor Co. v. United States*, 992 F. Supp. 2d 1346, 1355 (Ct. Int'l Trade 2014).  "The doctrine of law of the case generally bars retrial of issues that were previously resolved." *Intergraph Corp. v. Intel Corp.*, 253 F.3d 695, 697 (Fed. Cir. 2001).  Whether to apply this doctrine is within the discretion of the Court. *Hudson v. Principi*, 260 F.3d 1357, 1363 (Fed. Cir. 2001).

Pursuant to Rule 54(b), and consistent with *Hudson*, the Court may entertain a motion for reconsideration.  However, a reconsideration motion is not an opportunity for a losing party "to re-litigate the case or present arguments it previously raised." *Totes-Isotoner Corp. v. United States*, 580 F. Supp. 2d 1371, 1374 (Ct. Int'l Trade 2008).  Instead, the main grounds supporting a motion for reconsideration are "an intervening change in the controlling law, the availability of new evidence, the need to correct a clear factual or legal error, or the need to prevent manifest injustice." *Ford Motor Co. v. United State*s, 30 CIT 1587, 1588 (2006).

Plaintiffs contend that new information warrants reconsideration of the June 1, 2020 decision.  Pl. Br. 53-54.  Specifically, plaintiffs assert that Customs was considering distributing section 1505(d) interest at the time Customs published its NPRM on June 26, 2001.  Plaintiffs base this assertion on language from February 21, 2001 notes of a meeting of Customs Task Force members that "OF and OIT will consider possible methods for assigning 1505 interest to specific AD/CV cases . . ." (ARS511 at ¶10) – which, as we have already demonstrated above, was not the agency's position when the NPRM was published in June.  Additionally, the plaintiffs' acknowledgment of the language in ARS579, which contains a note that a decision has been made that accrued interest for late payment will not be made available for disbursement under the Byrd Amendment, is consistent with the NPRM that was published in June.  There is no dispute that, as part of its efforts to implement the CDSOA, Customs temporarily considered distributing both section 1677g and section 1505(d) interest.  ARS511.  Customs recognized that technological limitations of its computer system precluded distribution of section 1505(d) interest due to the inability to determine amounts of section 1505(d) interest associated with AD/CV duty orders, ARS006 at ¶ 4, and the decision not to distribute section 1505(d) under the CDSOA was made prior to the publication of the NPRM.

Furthermore, plaintiffs' argument is belied by the June 26 NPRM and the comments received concerning interest.  In the NPRM, Customs included a section on interest.  ARS130.  In that section, Customs explained that, although interest does not accrue on the clearing and special accounts themselves, "if there is interest paid by the importer on any antidumping or countervailing duties billed in the liquidation process for the import entries, that interest will be transferred to the Clearing Account or Special Account, as appropriate."  ARS130.  The only interest that could be paid regarding AD/CV duties billed in the *liquidation process* is section 1677g interest due on underpayments of AD/CV duty deposits.  Section 1505(d) interest would only be required after liquidation, if and when a bill was not paid by the importer within the first 30 days.  If distribution of section 1505(d) interest had been contemplated at this point, the NPRM would have so stated.  It does not.

As discussed *supra*, six public commenters agreed with Customs' treatment of interest as proposed in section 159.64(e).  *See* ARS147, 149, 251-252, 352, 391, and 414.  The Senators who participated in the notice-and-comment rulemaking, including Senator Byrd, expressed approval of Customs' treatment of interest, summarizing the CDSOA's interest requirement as distribution of section 1677g interest without any reduction for 1677g interest paid to importers when Customs refunds AD/CV duty deposits.  ARS391 ("[W]e appreciate the fact that you intend to distribute pursuant to the Act the full amount of assessed antidumping and countervailing duties, including interest paid by the importer at final liquidation but without any adjustment for interest remitted to the importer.  In our view any other construction of the Act would significantly undermine its purpose.")  This is consistent with Customs' position that only 1677g interest is distributable under the CDSOA.  Thus, the record provides support for

Customs' position and does not provide a basis for reconsideration of this Court's June 1, 2020 decision.

Moreover, as shown above in Part II, the unambiguous language of the CDSOA called only for the distribution of section 1677g interest.  Thus, the technological limitations actually prevented Customs from enacting a regulation that would be inconsistent with the unambiguous language of the CDSOA.

Nevertheless, plaintiffs cannot escape the fact that, as this Court held, the preamble to the Final Rule provided them with adequate notice that Customs was not distributing section 1505(d) interest under the CDSOA.  Plaintiffs cite no intervening change in controlling law that a preamble cannot provide notice; plaintiffs cannot refute that the preamble states what it states; plaintiffs cannot argue that the Court legally or factually erred in observing that the preamble included the term "only" when describing the distribution of section 1677g interest; and there is no manifest injustice in expecting the plaintiffs to be aware of the entirety of the Final Rule. Accordingly, reconsideration of the adequate notice issue is not warranted.

## <u>CONCLUSION</u>

For the foregoing reasons, we respectfully request that plaintiffs' motion for judgment on the agency record be denied and judgment entered for defendants.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

<u>/s/Justin R. Miller</u>
By:    JUSTIN R. MILLER
Attorney-in-Charge
International Trade Field Office

*Of Counsel*                                  <u>/s/ Beverly A. Farrell</u>
SUZANNA HARTZELL-BALLARD        BEVERLY A. FARRELL
JESSICA PLEW                               Senior Trial Attorney
Office of Assistant Chief Counsel       Civil Division, Dept. of Justice
U.S. Customs and Border Protection    Commercial Litigation Branch
6650 Telecom Drive, Suite 101          26 Federal Plaza – Suite 346
Indianapolis, Indiana 46278              New York, NY 10278
Tel. (212) 264-9230 or 0483
Attorneys for Defendants

Dated: August 9, 2021

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

---

| | | |
|---|---|---|
| | : | |
| AMERICAN DREW, INC., *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Court No. 17-00086 |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, *et al.,* | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

## **CERTIFICATE OF COMPLIANCE**

I, BEVERLY A. FARRELL, a senior trial attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is the attorney responsible for Defendants' Response to Plaintiffs' Motion for Judgment on the Agency Record and for Reconsideration, relying upon the word count feature of the word processing program used to prepare the response, certify that this memorandum complies with the word count limitation under the Court's chambers procedures and contains 12,948 words.

/s/ Beverly A. Farrell
Beverly A. Farrell

ATTACHMENT

tive determination of material injury was not applicable at the time the investigation was initiated, the Commission shall—

(1) in the case of an investigation in progress, make a final determination under section 1671d(b) of this title within 75 days after the date of an affirmative final determination, if any, by the administering authority,

(2) in the case of a suspended investigation to which section 1671c(i)(1)(B) of this title applies, make a final determination under section 1671d(b) of this title within 120 days after receiving notice from the administering authority of the resumption of the investigation pursuant to section 1671c(i) of this title, or within 45 days after the date of an affirmative final determination, if any, by the administering authority, whichever is later, or

(3) in the case of a suspended investigation to which section 1671c(i)(1)(C) of this title applies, treat the countervailing duty order issued pursuant to such section as if it were—

(A) an order issued under subsection (a)(1)(B)(ii) of this section for purposes of subsection (a)(3) of this section; and

(B) an order issued under subsection (a)(1)(B)(i) of this section for purposes of subsection (a)(4) of this section.

**(d) Publication in Federal Register**

The administering authority or the Commission, as the case may be, shall publish in the Federal Register a notice of the initiation of any investigation, and a notice of any determination or revocation, made pursuant to this section.

**(e) Request for simultaneous expedited review under section 1675(c)**

**(1) General rule**

**(A) Requests for reviews**

Notwithstanding section 1675(c)(6)(A) of this title and except as provided in subparagraph (B), an interested party may request a review of an order under section 1675(c) of this title at the same time the party requests an investigation under subsection (a) of this section, if the order involves the same or comparable subject merchandise. Upon receipt of such request, the administering authority, after consulting with the Commission, shall initiate a review of the order under section 1675(c) of this title. The Commission shall combine such review with the investigation under this section.

**(B) Exception**

If the administering authority determines that the interested party who requested an investigation under this section is a related party or an importer within the meaning of section 1677(4)(B) of this title, the administering authority may decline a request by such party to initiate a review of an order under section 1675(c) of this title which involves the same or comparable subject merchandise.

**(2) Cumulation**

If a review under section 1675(c) of this title is initiated under paragraph (1), such review

shall be treated as having been initiated on the same day as the investigation under this section, and the Commission may, in accordance with section 1677(7)(G) of this title, cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which such investigations are treated as initiated on the same day.

**(3) Time and procedure for Commission determination**

The Commission shall render its determination in the investigation conducted under this section at the same time as the Commission's determination is made in the review under section 1675(c) of this title that is initiated pursuant to this subsection. The Commission shall in all other respects apply the procedures and standards set forth in section 1675(c) of this title to such section 1675(c) of this title reviews.

(June 17, 1930, ch. 497, title VII, §753, as added Pub. L. 103–465, title II, §271(a), Dec. 8, 1994, 108 Stat. 4918; amended Pub. L. 104–295, §39, Oct. 11, 1996, 110 Stat. 3540.)

REFERENCES IN TEXT

Section 1303 of this title, referred to in subsecs. (a)(2) and (c), is defined in section 1677(26) of this title to mean section 1330 as in effect on the day before Jan. 1, 1995.

AMENDMENTS

1996—Pub. L. 104–295, §39(1), inserted ''or section 1671(c)'' after ''section 1303'' in section catchline.

Subsecs. (a)(2), (c). Pub. L. 104–295 inserted ''or section 1671(c) of this title'' after ''section 1303 of this title'' and struck out ''under section 1303(a)(2) of this title'' after ''material injury''.

EFFECTIVE DATE

Section effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States [Jan. 1, 1995], and applicable with respect to investigations, reviews and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as an Effective Date of 1994 Amendment note under section 1671 of this title.

URUGUAY ROUND AGREEMENTS: ENTRY INTO FORCE

The Uruguay Round Agreements, including the World Trade Organization Agreement and agreements annexed to that Agreement, as referred to in section 3511(d) of this title, entered into force with respect to the United States on Jan. 1, 1995. See note set out under section 3511 of this title.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1516a, 1675, 1677e, 1677f, 1677m of this title.

**§ 1675c. Continued dumping and subsidy offset**

**(a) In general**

Duties assessed pursuant to a countervailing duty order, an antidumping duty order, or a finding under the Antidumping Act of 1921 shall be distributed on an annual basis under this section to the affected domestic producers for qualifying expenditures. Such distribution shall be known as the ''continued dumping and subsidy offset''.

**(b) Definitions**

As used in this section:

**(1) Affected domestic producer**

The term "affected domestic producer" means any manufacturer, producer, farmer, rancher, or worker representative (including associations of such persons) that—

(A) was a petitioner or interested party in support of the petition with respect to which an antidumping duty order, a finding under the Antidumping Act of 1921, or a countervailing duty order has been entered, and

(B) remains in operation.

Companies, businesses, or persons that have ceased the production of the product covered by the order or finding or who have been acquired by a company or business that is related to a company that opposed the investigation shall not be an affected domestic producer.

**(2) Commissioner**

The term "Commissioner" means the Commissioner of Customs.

**(3) Commission**

The term "Commission" means the United States International Trade Commission.

**(4) Qualifying expenditure**

The term "qualifying expenditure" means an expenditure incurred after the issuance of the antidumping duty finding or order or countervailing duty order in any of the following categories:

(A) Manufacturing facilities.

(B) Equipment.

(C) Research and development.

(D) Personnel training.

(E) Acquisition of technology.

(F) Health care benefits to employees paid for by the employer.

(G) Pension benefits to employees paid for by the employer.

(H) Environmental equipment, training, or technology.

(I) Acquisition of raw materials and other inputs.

(J) Working capital or other funds needed to maintain production.

**(5) Related to**

A company, business, or person shall be considered to be "related to" another company, business, or person if—

(A) the company, business, or person directly or indirectly controls or is controlled by the other company, business, or person,

(B) a third party directly or indirectly controls both companies, businesses, or persons,

(C) both companies, businesses, or persons directly or indirectly control a third party and there is reason to believe that the relationship causes the first company, business, or persons to act differently than a non-related party.

For purposes of this paragraph, a party shall be considered to directly or indirectly control another party if the party is legally or operationally in a position to exercise restraint or direction over the other party.

**(c) Distribution procedures**

The Commissioner shall prescribe procedures for distribution of the continued dumping or subsidies offset required by this section. Such distribution shall be made not later than 60 days after the first day of a fiscal year from duties assessed during the preceding fiscal year.

**(d) Parties eligible for distribution of antidumping and countervailing duties assessed**

**(1) List of affected domestic producers**

The Commission shall forward to the Commissioner within 60 days after the effective date of this section in the case of orders or findings in effect on January 1, 1999, or thereafter, or in any other case, within 60 days after the date an antidumping or countervailing duty order or finding is issued, a list of petitioners and persons with respect to each order and finding and a list of persons that indicate support of the petition by letter or through questionnaire response. In those cases in which a determination of injury was not required or the Commission's records do not permit an identification of those in support of a petition, the Commission shall consult with the administering authority to determine the identity of the petitioner and those domestic parties who have entered appearances during administrative reviews conducted by the administering authority under section 1675 of this title.

**(2) Publication of list; certification**

The Commissioner shall publish in the Federal Register at least 30 days before the distribution of a continued dumping and subsidy offset, a notice of intention to distribute the offset and the list of affected domestic producers potentially eligible for the distribution based on the list obtained from the Commission under paragraph (1). The Commissioner shall request a certification from each potentially eligible affected domestic producer—

(A) that the producer desires to receive a distribution;

(B) that the producer is eligible to receive the distribution as an affected domestic producer; and

(C) the qualifying expenditures incurred by the producer since the issuance of the order or finding for which distribution under this section has not previously been made.

**(3) Distribution of funds**

The Commissioner shall distribute all funds (including all interest earned on the funds) from assessed duties received in the preceding fiscal year to affected domestic producers based on the certifications described in paragraph (2). The distributions shall be made on a pro rata basis based on new and remaining qualifying expenditures.

**(e) Special accounts**

**(1) Establishments**

Within 14 days after the effective date of this section, with respect to antidumping duty orders and findings and countervailing duty

TITLE 19—CUSTOMS DUTIES

orders notified under subsection (d)(1) of this section, and within 14 days after the date an antidumping duty order or finding or countervailing duty order issued after the effective date takes effect, the Commissioner shall establish in the Treasury of the United States a special account with respect to each such order or finding.

**(2) Deposits into accounts**

The Commissioner shall deposit into the special accounts, all antidumping or countervailing duties (including interest earned on such duties) that are assessed after the effective date of this section under the antidumping order or finding or the countervailing duty order with respect to which the account was established.

**(3) Time and manner of distributions**

Consistent with the requirements of subsections (c) and (d) of this section, the Commissioner shall by regulation prescribe the time and manner in which distribution of the funds in a special account shall be made.

**(4) Termination**

A special account shall terminate after—

(A) the order or finding with respect to which the account was established has terminated;

(B) all entries relating to the order or finding are liquidated and duties assessed collected;

(C) the Commissioner has provided notice and a final opportunity to obtain distribution pursuant to subsection (c) of this section; and

(D) 90 days has elapsed from the date of the notice described in subparagraph (C).

Amounts not claimed within 90 days of the date of the notice described in subparagraph (C), shall be deposited into the general fund of the Treasury.

(June 17, 1930, ch. 497, title VII, §754, as added Pub. L. 106–387, §1(a) [title X, §1003(a)], Oct. 28, 2000, 114 Stat. 1549, 1549A–73.)

REFERENCES IN TEXT

The Antidumping Act of 1921, referred to in subsecs. (a) and (b)(1)(A), probably means the Antidumping Act, 1921, act May 27, 1921, ch. 14, title II, 42 Stat. 11, as amended, which was classified generally to sections 160 to 171 of this title, and was repealed by Pub. L. 96–39, title I, §106(a), July 26, 1979, 93 Stat. 193.

For effective date of this section, referred to in subsecs. (d)(1), (e)(1), and (2), see Effective Date note set out below.

EFFECTIVE DATE

Pub. L. 106–387, §1(a) [title X, §1003(c)], Oct. 28, 2000, 114 Stat. 1549, 1549A–75, provided that: ''The amendments made by this section [enacting this section] shall apply with respect to all antidumping and countervailing duty assessments made on or after October 1, 2000.''

FINDINGS OF CONGRESS

Pub. L. 106–387, §1(a) [title X, §1002], Oct. 28, 2000, 114 Stat. 1549, 1549A–72, provided that: ''Congress makes the following findings:

''(1) Consistent with the rights of the United States under the World Trade Organization, injurious dump-

ing is to be condemned and actionable subsidies which cause injury to domestic industries must be effectively neutralized.

''(2) United States unfair trade laws have as their purpose the restoration of conditions of fair trade so that jobs and investment that should be in the United States are not lost through the false market signals.

''(3) The continued dumping or subsidization of imported products after the issuance of antidumping orders or findings or countervailing duty orders can frustrate the remedial purpose of the laws by preventing market prices from returning to fair levels.

''(4) Where dumping or subsidization continues, domestic producers will be reluctant to reinvest or rehire and may be unable to maintain pension and health care benefits that conditions of fair trade would permit. Similarly, small businesses and American farmers and ranchers may be unable to pay down accumulated debt, to obtain working capital, or to otherwise remain viable.

''(5) United States trade laws should be strengthened to see that the remedial purpose of those laws is achieved.''

SUBPART B—CONSULTATIONS AND DETERMINATIONS REGARDING QUANTITATIVE RESTRICTION AGREEMENTS

**§ 1676. Required consultations**

**(a) Agreements in response to countervailable subsidies**

Within 90 days after the administering authority accepts a quantitative restriction agreement under section 1671c(a)(2) or (c)(3) of this title, the President shall enter into consultations with the government that is party to the agreement for purposes of—

(1) eliminating the countervailable subsidy completely, or

(2) reducing the net countervailable subsidy to a level that eliminates completely the injurious effect of exports to the United States of the merchandise.

**(b) Modification of agreements on basis of consultations**

At the direction of the President, the administering authority shall modify a quantitative restriction agreement as a result of consultations entered into under subsection (a) of this section.

**(c) Special rule regarding agreements under section 1671c(c)(3) of this title**

This chapter shall cease to apply to a quantitative restriction agreement described in section 1671c(c)(3) of this title at such time as that agreement ceases to have force and effect under section 1671c(f) of this title or violation is found under section 1671c(i) of this title.

(June 17, 1930, ch. 497, title VII, §761, as added Pub. L. 98–573, title VI, §611(a)(4), Oct. 30, 1984, 98 Stat. 3031; amended Pub. L. 103–465, title II, §270(a)(1)(I), (b)(1)(C), (2), Dec. 8, 1994, 108 Stat. 4917.)

AMENDMENTS

1994—Subsec. (a). Pub. L. 103–465, §270(b)(1)(C), (2), inserted ''countervailable'' before ''subsidies'' in heading.

Subsec. (a)(1), (2). Pub. L. 103–465, §270(a)(1)(I), inserted ''countervailable'' before ''subsidy''.

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO