# UNITED STATES COURT OF INTERNATIONAL TRADE
## THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | | |
|---|---|---|
| AMERICAN DREW, INC., et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | No. 17-00086 |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## ORDER

Upon consideration of the Rule 56.1 Motion for Judgment on the Administrative Record of Plaintiffs, American Drew, Inc., et al. ("Plaintiffs"), including Plaintiffs' motion for reconsideration of the Court's June 1, 2020 Opinion and Order granting in part U.S. Customs and Border Protection's ("CBP") motion to dismiss certain aspects of the Plaintiffs' complaint, all responses thereto, and the administrative record, it is hereby

ORDERED that Plaintiffs' Motion for Judgment on the Administrative Record is granted; it is further

ORDERED that Plaintiffs' Motion for Reconsideration of the Court's June 1, 2020 Opinion and Order granting in part CBP's motion

to dismiss certain aspects of Plaintiffs' complaint (Slip Op. 20-76) is granted and that the two-year statute of limitations contained in 28 U.S.C. § 2636(i) does not bar relief with respect to CDSOA distributions that predate April 18, 2015; it is further

ORDERED that the CDSOA's references to "interest earned" in 19 U.S.C. § 1675c(e)(2) and (d)(3) include delinquency interest under 19 U.S.C. § 1505(d); it is further

ORDERED with respect to payments of delinquency interest pursuant to 19 U.S.C. § 1505(d) paid to CBP on antidumping duties owed under the antidumping orders listed in paragraph 2 of the Complaint (the "Orders") that CBP is required by law to include all such amounts in its CDSOA distributions to affected domestic producers under the Orders, including Plaintiffs, based on their *pro rata* shares of total certified qualifying expenditures thereunder, for the federal fiscal year in which CBP received such payment; it is further ORDERED that Plaintiffs are entitled to an accounting by CBP, by Fiscal Year, of all delinquency interest not distributed to Plaintiffs under the Orders; and it is further

ORDERED that Plaintiffs are entitled to an award, pursuant to 28 U.S.C. § 2643(a), of equitable interest to the extent necessary to

compensate Plaintiffs for Customs' failure to distribute the foregoing amount within the time required by law pursuant to 19 U.S.C. § 1675c(c).

SO ORDERED.

_____

Honorable Timothy C. Stanceu, Senior Judge
United States Court of International Trade

Dated:_____, 2021

# UNITED STATES COURT OF INTERNATIONAL TRADE
# THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

AMERICAN DREW, INC., et al.,    )
    )
      *Plaintiffs,*    )
    )
v.    )     No. 17-00086
    )
UNITED STATES OF AMERICA, et al., )
    )
      *Defendants.*    )
_____)

## REPLY IN SUPPORT OF PLAINTIFFS'
## RULE 56.1 MOTION FOR JUDGMENT ON THE
## ADMINISTRATIVE RECORD AND FOR RECONSIDERATION

J. Michael Taylor
Jeffrey M. Telep
Jeremy M. Bylund
Neal J. Reynolds
KING & SPALDING LLP
1730 Pennsylvania Ave., NW
Washington, D.C. 20006
(202) 737-0500

*Counsel to Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ............................................................................... 1

ARGUMENT ....................................................................................... 3

I.   The CDSOA Unambiguously Requires Distribution of
     Delinquency Interest, Which CBP Recognized Before
     Yielding to a Technical Limitation ......................................... 3

II.  DOJ's Interpretation Is Inconsistent With the Plain Text
     of the CDSOA ........................................................................... 4

     A.   The word "assessed" does not modify "interest" .................... 5

     B.   DOJ's interpretation effectively reads the word "all"
          out of the statute .................................................................. 9

     C.   DOJ's interpretation is inconsistent with the
          statutory scheme ................................................................. 12

     D.   The legislative history of the CDSOA and TFTEA
          undermines DOJ's "interpretation" ..................................... 14

     E.   DOJ's interpretation is not a permissible reading of
          any statutory ambiguity ...................................................... 17

III. CBP's Faulty Administrative Action Is Not Entitled to
     Deference .................................................................................. 18

     A.   Under *Encino Motorcars* and *Aqua Products*, CBP
          cannot receive deference for an "interpretation" that
          it did not analyze or explain in the record ........................... 19

     B.   The dispositive word "only" is not in the text of the
          regulation, so *Chevron* deference does not apply ................. 21

     C.   If CBP is correct that its final rule excludes
          delinquency interest, the rule is arbitrary and
          capricious ............................................................................. 24

D.    CBP's remaining arguments are unpersuasiv. ....................28

IV.   The Court Should Reconsider Its Ruling on CBP's Motion
to Dismiss ........................................................................32

CONCLUSION ..........................................................................35

CERTIFICATE OF COMPLIANCE WITH THE COURT OF
INTERNATIONAL TRADE'S STANDARD CHAMBERS
PROCEDURES

CERTIFICATE OF SERVICE FOR ELECTRONIC FILING

# TABLE OF AUTHORITIES

## Cases

*Andrus v. Shell Oil Co.*,
   446 U.S. 657 (1980) ................................................................. 16

*Aqua Prods., Inc. v. Matal*,
   872 F.3d 1290 (Fed. Cir. 2017) ............................................... 19

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ................................................................... 5

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) ................................................................. 18

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*,
   447 U.S. 102 (1980) ................................................................. 17

*Dep't of Com. v. New York*,
   139 S. Ct. 2551 (2019) ...................................................... 21, 28

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016) ................................... 19, 20, 21, 25

*Entergy Corp. v. Riverkeeper, Inc.*,
   556 U.S. 208 (2009) ................................................................... 5

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
   545 U.S. 546 (2005) ................................................................. 14

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ................................................................. 25

*Ford Motor Co. v. United States*,
   30 CIT 1587 (2006) ................................................................. 33

*GHS Health Maint. Org., Inc. v. United States*,
   536 F.3d 1293 (Fed. Cir. 2008) ............................................... 23

*Gonzales v. Oregon*,
   546 U.S. 243 (2006) ................................................................. 29

*Hughes Aircraft Co. v. Jacobson,*
    525 U.S. 432 (1999) ...................................................................5

*Hymas v. United States,*
    810 F.3d 1312 (Fed. Cir. 2016)................................................30

*La. Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986) .................................................................24

*Leslie Salt Co. v. United States,*
    55 F.3d 1388 (9th Cir. 1995) ...................................................27

*Microsoft Corp. v. i4i Ltd. P'ship,*
    564 U.S. 91 (2011) ...................................................................14

*Montgomery Co. v. FCC,*
    863 F.3d 485 (6th Cir. 2017) ...................................................20

*N.H. Hosp. Ass'n v. Azar,*
    887 F.3d 62 (1st Cir. 2018)................................................25, 27

*Nat'l Black Media Coal. v. FCC,*
    791 F.2d 1016 (2d Cir. 1986)...................................................25

*Nat'l Wildlife Fed'n v. EPA,*
    286 F.3d 554 (D.C. Cir. 2002)..................................................30

*NLRB v. Sw. Gen., Inc.,*
    137 S. Ct. 929 (2017) ...............................................................23

*Norfolk & W. Ry. Co. v. Am. Train Dispatchers' Ass'n,*
    499 U.S. 117 (1991) .................................................................11

*Northpoint Tech., Ltd. v. FCC,*
    412 F.3d 145 (D.C. Cir. 2005)..................................................18

*Novosteel SA v. United States,*
    284 F.3d 1261 (Fed. Cir. 2002).................................................22

*Pa. Dep't of Pub. Welfare v. Davenport,*
    495 U.S. 552 (1990) ...................................................................9

*Ragsdale v. Wolverine World Wide, Inc.,*
  535 U.S. 81 (2002) ........................................................................ 23

*S. Shrimp All. v. United States,*
  617 F. Supp. 2d 1334 (Ct. Int'l Trade 2009) ....................................... 31

*SAS Inst. Inc. v. Iancu,*
  138 S. Ct. 1348 (2018) .................................................................. 29

*SEC v. Chenery Corp.,*
  318 U.S. 80 (1943) ................................................................... 24, 27

*Skidmore v. Swift & Co.,*
  323 U.S. 134 (1944) ...................................................................... 31

*Smiley v. Citibank (S.D.), N.A.,*
  517 U.S. 735 (1996) ...................................................................... 31

*Soc. Sec. Bd. v. Nierotko,*
  327 U.S. 358 (1946) ...................................................................... 29

*Splane v. West,*
  216 F.3d 1058 (Fed. Cir. 2000)......................................................... 30

*Syva Co. v. United States,*
  681 F. Supp. 885 (Ct. Int'l Trade 1988) .............................................. 6

*U.S. Capitol Police v. Office of Compliance,*
  908 F.3d 748 (Fed. Cir. 2018)........................................................... 13

*United Sav. Ass'n of Tex.*
  *v. Timbers of Inwood Forest Assocs., Ltd.,*
  484 U.S. 365 (1988) ...................................................................... 8

*United States v. Fisher,*
  6 U.S. (2 Cranch) 358 (1805)........................................................... 16

*United States v. Mead Corp.,*
  533 U.S. 218 (2001) .................................................................. 29, 31

*Util. Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014) ...................................................................... 18

*Veterans Justice Grp., LLC v. Sec'y of Veterans Affairs*,
    818 F.3d 1336 (Fed. Cir. 2016) ............................................................ 26

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) .............................................................................. 28

**Statutes**

19 U.S.C. § 1505 ...................................................................... *passim*

19 U.S.C. § 1675c (2000)
    (repealed Pub. L. No. 109-171, 120 Stat. 4 (2006)) ...................... *passim*

19 U.S.C. § 1677g ..................................................................... *passim*

**Regulations**

19 C.F.R. § 159.64(e) ............................................................................ 21

19 C.F.R. § 24.3a(c)(3) ........................................................................... 6

**Other Authorities**

62 Cong. Rec. S843 (daily ed. Feb 11, 2016)
    (statement of Sen. Thune) ............................................................ 15, 16

Antonin Scalia & Bryan A. Garner,
    Reading Law: The Interpretation of Legal Texts (2012) ............... 13, 22

## INTRODUCTION

The opposition brief of U.S. Customs and Border Protection ("CBP") cannot overcome the plain, straightforward meaning of the Continued Dumping and Subsidy Offset Act of 2000 ("CDSOA"). Its arguments are belied by the administrative record. As the Administrative Record Supplement ("ARS") shows, even CBP did not ascribe to the interpretation of the statute that the Department of Justice ("DOJ") now advances in its brief. In a *sworn declaration*, the *CBP representative* stated that "the only reason" of which he was aware for CBP's decision not to distribute delinquency interest was a technical limitation—not because the statute requires that approach, as DOJ now argues. The ARS demonstrates, in fact, that CBP initially concluded that it was required to distribute delinquency interest.

Even if the CDSOA were susceptible to multiple readings, this Court should pay no deference to the interpretation DOJ now advances. First, the ARS contains no evidence whatsoever that the interpretation advanced by DOJ was CBP's interpretation when it promulgated the regulation. To the contrary, the *only reason* given in the record for CBP's failing to distribute delinquency interest was a technical limitation.

DOJ's *post-hoc*, made-for-litigation statutory interpretation cannot receive deference.

Second, the ARS shows that CBP changed its mind between the proposed rule and final rule but failed to apprise the public of its 180-degree change in course. That change was not enshrined in the text of the regulation. Instead, the language on which DOJ's "interpretation" relies is tucked away in an obscure, unrelated section of the preamble to the final rule. Preambles are not entitled to *Chevron* deference, especially when they depart from the proposed rule without explanation or comment. And the record confirms that CBP never actually "interpreted" anything, but instead CBP has completely ignored the statutory text of the CDSOA because of its technical limitations. Such arbitrary action is owed no deference.

Finally, Plaintiffs have also established that the Court should reconsider its order on CBP's motion to dismiss. The ARS dispels any notion that CBP possibly could have put Plaintiffs on notice that CBP would not distribute delinquency interest. In fact, the ARS indicates that CBP understood at the time it issued the proposed rule that delinquency interest *should* be distributed. Plaintiffs were not required to anticipate

CBP's blatant disregard of administrative law and the text of the CDSOA.

## ARGUMENT

### I. The CDSOA Unambiguously Requires Distribution of Delinquency Interest, Which CBP Recognized Before Yielding to a Technical Limitation.

The Court can reject DOJ's made-for-litigation *Chevron* Step One argument with ease. The CDSOA clearly directs that CBP "shall distribute all funds (including *all interest earned* on the funds) from assessed duties received in the preceding fiscal year to affected domestic producers." 19 U.S.C. § 1675c(d)(3) (2000) (emphasis added) (repealed Pub. L. No. 109-171, § 7601(a), 120 Stat. 4, 154 (2006)); *see also id.* § 1675c(e)(2) (CBP "shall deposit into the special accounts, *all* antidumping and countervailing duties (including interest earned on such duties) that are assessed after the effective date of this section." (emphasis added)). This plain language is dipositive. In context and as a matter of ordinary English, "all interest" necessarily refers *both* to interest under 19 U.S.C. § 1677g(a) (for underpayments deposited at the time of entry), *and* delinquency interest under 19 U.S.C. § 1505(d) (which accrues on an importer's unpaid balance).

3

Remarkably, DOJ appears to contend that the CDSOA unambiguously compels the opposite interpretation, even as the government concedes that CBP "temporarily considered distributing section 1505(d) interest." ECF No. 88 ("Opp.") 31. The ARS shows that CBP itself initially thought that the CDSOA required CBP to distribute delinquency interest to Affected Domestic Producers ("ADPs") and prepared to do so. ARS 510-11. CBP would not have taken this step if the statute unambiguously prohibited distributing such interest. CBP, however, apparently changed course after publishing its proposed rule. *See* ARS 577-79. In a sworn declaration, CBP's representative declared that this change was due to a *technical inability* to account separately for delinquency interest, *see* ARS 006—not due to CBP's interpretation of the CDSOA. The Court should see DOJ's "plain text" argument for what it is: a transparent *post-hoc*, made-for-litigation attempt to cover up for the fact that some twenty years ago CBP ignored the plain language of the CDSOA due to CBP's technological limitations.

## II.   DOJ's Interpretation Is Inconsistent With the Plain Text of the CDSOA.

DOJ has misinterpreted the CDSOA. Its interpretation is not *compelled* by the statutory text under *Chevron* Step One, where the

question is "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). And in fact, DOJ's interpretation is *foreclosed* by the statutory text and is therefore not even reasonable under *Chevron* Step Two. *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 n.4 (2009) ("{I}f Congress has directly spoken to an issue then any agency interpretation contradicting what Congress has said would be unreasonable."); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) ("{W}here the statutory language provides a clear answer, {our analysis} ends there.").

DOJ arrives at its contra-textual position through a series of interpretive errors: misunderstanding what the word "assessed" modifies; incorrectly focusing on "context" and "Congress' statutory scheme" while ignoring the dispositive statutory text; and misconstruing the legislative history (even as it contends that legislative history is irrelevant).

## A.    The word "assessed" does not modify "interest."

DOJ's "plain text" statutory interpretation (and in truth, the vast majority of the argument in its brief) hinges on one word: "assessed,"

which appears in both § 1675c(d)(3) and § 1675c(e)(2). According to DOJ, "the word 'assessed' implicates a specific temporal event: liquidation," and "{t}he only type of interest that is assessed on AD/CV duties at liquidation is 19 U.S.C. § 1677g interest."[1] Opp. 16. Ergo, under DOJ's interpretation, by using the word "assessed," Congress limited CDSOA distributions to § 1677g interest (and in fact affirmatively precluded CBP from distributing delinquency interest).

Even if the word "assessed" in § 1675c(d)(3) and § 1675c(e)(2) means what DOJ says it does,[2] that does not matter because "assessed" does not modify "interest" in either subsection. *Contra* Opp. 16. Rather, in both

---

[1] DOJ's interpretation of "assessed" is merely a reformulation of its argument that, under the text of the regulation, "at liquidation" can mean only § 1677g interest. But this Court already has rejected the idea that the phrase "at liquidation," standing alone and without CBP's unlawful preamble, can convey that meaning. *See* ECF No. 57 ("Opinion") 11-12.

[2] CBP is wrong that the term "assessed" can only refer to duties assessed at liquidation. Rather, as this Court has recognized, delinquency interest is "assessed" for late payments. *Syva Co. v. United States*, 681 F. Supp. 885, 886 (Ct. Int'l Trade 1988) ("Plaintiff has not remitted $1,137.52 in accrued interest *assessed* on the delinquent payment of liquidated duties." (emphasis added)). CBP's regulations also recognize that delinquency interest is "assessed." 19 C.F.R. § 24.3a(c)(3) ("Interest on overdue bills [*i.e.*, § 1505(d) interest] will be *assessed* on the delinquent principal amount by 30-day periods." (emphasis added)).

subsections, "assessed" modifies only "duties." Section 1675c(d)(3) could hardly be clearer: It directs CBP to "distribute all funds … from *assessed* duties," and in a parenthetical the statute confirms that the distribution should "includ{e} all interest earned on the funds." The adjective "assessed" modifies its direct referent, "duties." By contrast, the parenthetical text "including all interest earned on the funds" modifies the subsection's core command that CBP "distribute all funds." And that makes sense—both duties and interest are "funds" that arise "from assessed duties." *See* ECF No. 81 ("Opening Br.") 24. The statute unambiguously directs CBP to distribute "all funds (including all interest earned on the funds)," without regard to when they accrue or are assessed.

The same conclusion can be drawn from § 1675c(e)(2). The statute directs CBP to deposit into the special accounts "all antidumping and countervailing duties … that are assessed under the antidumping order or finding or the countervailing duty order." *Id.* § 1675c(e)(2). The statue specifies, again in a parenthetical, that the deposit should "includ{e} interest earned on such duties." Here too, "assessed" is an adjective that modifies "all antidumping and countervailing duties." But the statute

7

tells CBP to deposit the "interest earned on such duties," without regard to when that interest accrues or is assessed. And to the extent § 1675c(e)(2) is unclear, it must be interpreted in line with § 1675c(d)(3), which is completely clear, because "only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988).

Thus, even if DOJ is correct that "assessed" means assessed at liquidation, the point is irrelevant because "assessed" does not modify "interest" in either subsection. Rather, "interest" is modified by "earned on the funds," and "earned on such duties," respectively. 19 U.S.C. § 1675c(d)(3), (e)(2). Plaintiffs do not dispute that antidumping and countervailing duties are "assessed" at liquidation,[3] but regardless,

---

[3] CBP's argument that, under Plaintiffs' interpretation "interest payable to an importer due to an overpayment of deposited amounts of AD/CV duties would be interest earned on the funds and should be distributed to them rather than returned to the importer," Opp. 20 n.7, is wrong. Duties are assessed at liquidation, so interest owed to an importer as a result of overpayment is not interest "from assessed duties," because that interest accrues on the importer's overpayment of cash deposits, rather than the balance of duties assessed at liquidation. In contrast, where there is an underpayment resulting in § 1677g interest, the interest accrues on the unpaid portion of the assessed duty amount.

§ 1505(d) interest is "earned" on those duties well after liquidation, when an importer fails to pay a bill for assessed duties within 30 days after CBP issues the bill. 19 U.S.C. § 1505(d). Based on the statutory text, any "temporal" limitation, Opp. 16, applies only to the duties themselves—not the interest.

### B. DOJ's interpretation effectively reads the word "all" out of the statute.

DOJ argues that "all interest" cannot cover delinquency interest and covers only § 1677g interest. In arguing that "all interest" does not mean all interest, DOJ impermissibly reads the word "all" out of the statue. *See Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 562 (1990) (expressing "deep reluctance" to interpret statutory provisions "to render superfluous other provisions in the same enactment").

DOJ properly recognizes that the word "all" must be given some meaning and appears to have landed on the following: "Instead, {of including delinquency interest} 'all interest' means that Customs should distribute all 1677g interest and should not deduct any amount to cover 1677g interest the government pays to importers when the final AD/CV duty rate is lower than the deposit rate and the importer receives a refund." Opp. 19; *id.* at 21, 22, 27 (making similar point). This is a

remarkable position because CBP in fact *does not* distribute all § 1677g interest—it offsets the duties and § 1677g interest that should have been distributed to ADPs by the amounts of any unpaid delinquency interest (an improper practice that was never publicly published or explained). *See* ECF No. 5 ("Compl.") ¶¶ 11-16. Thus, CBP's actual practice is inconsistent with the statutory interpretation DOJ now advances and is contrary to the legislative history quoted by the government. *See* Opp. 19 (quoting Sen. Byrd).[4] The government's only attempt to give meaning to the word "all" is a red herring—and as a result, that crucial word has essentially no meaning under DOJ's interpretation.

Finally, DOJ argues that for the term "all" actually to mean all, "the statute must not contain language contextually providing for qualifications or limitations," and according to DOJ, "{t}he cases plaintiffs cite … make this very point." Opp. 20. But the "point" is unremarkable; these cases merely say that "all" does not refer to every single instance of something. *Norfolk & W. Ry. Co. v. Am. Train*

---

[4] Notably, the legislative history cited by the government does not relate to delinquency interest. That legislative history is about *not reducing* the interest paid to ADPs, which cuts against the government's position of withholding delinquency interest. *Infra* 14-17.

*Dispatchers' Ass'n*, 499 U.S. 117, 129 (1991), is illustrative. There, the Supreme Court held that the phrase "{a} carrier, corporation, or person participating in that approved or exempted transaction is exempt from the antitrust laws and from *all other law*" was broad enough to exempt carriers from requirements imposed by collective bargaining agreements, but the statutory language did not grant them a license to ignore literally every law with impunity. *Id.* at 127 (emphasis added). Such a holding would have been absurd, which the Court explicitly recognized. *Id.*

Plaintiffs do not dispute that "context" often limits the scope of the word "all." Indeed, it does so here. The term "all interest" refers to all types of interest invoiced in connection with AD or CVD orders. There are two such types of interest relevant here: interest under 19 U.S.C. § 1677g(a) for underpayments deposited at the time of entry of the import and delinquency interest under 19 U.S.C. § 1505(d). Obviously, "all interest" under the CDSOA does not mean all interest *ad absurdum*, so the term excludes, for example, types of "interest" that have nothing to do with the CDSOA—for example, interest earned by an individual on her savings account or paid to a bank on her mortgage note. Thus, in the context of a statute where there are two relevant types of interest, "all

interest" cannot mean anything other than *both* § 1677g interest *and* delinquency interest, as Plaintiffs have explained (and as CBP itself once believed). *Supra* 3-4; *see also* Opening Br. 21-26.

## C. DOJ's interpretation is inconsistent with the statutory scheme.

DOJ's appeal to "Congress' statutory scheme" is even less persuasive. As the government concedes, "{T}he purpose of {the CDSOA} is to distribute AD/CV duties to ADPs rather than to the general fund of the U.S. Treasury," Opp. 21-22, but the government then states (without analysis) that "limiting CDSOA interest to section 1677g" is "{c}onsistent with this purpose." Opp. 22. That conclusion does not follow. When it enacted the CDSOA, Congress was concerned with the financial condition of ADPs, not the Treasury. If importers are delinquent in paying their duties, it would make sense for Congress to direct CBP to distribute that interest to ADPs (who would be harmed by such delinquency) instead of depositing that interest in the Treasury. *See* Opening Br. 27-29.

Next, DOJ highlights the difference in statutory language between § 1675c(e)(2) and § 1675c(d)(3) and argues that the two provisions "are only squared under the Government's analysis of the interest language."

Opp. 22. DOJ is flatly wrong that its strained interpretation is the only way to "reconcile{}" the two subsections, § 1675c(e)(2) and § 1675c(d)(3). The former speaks of "interest earned on such duties," and the latter speaks of "all interest earned on the funds." Duties are a type of fund, and both § 1677g interest and delinquency interest are types of "interest earned" on the funds. There is no inconsistency with Plaintiffs' interpretation (while in contrast, DOJ's interpretation depends on the incorrect meaning it gives to the words "assessed" and "all," Opp. 22; *supra* 5-12). Section 1675c(d)(3)'s command that CBP distribute "all interest" to ADPs is simply rendered meaningless unless § 1675c(e)(2) is interpreted to require that CBP deposit the same amount of interest in the special accounts. "{T}here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously." *U.S. Capitol Police v. Office of Compliance*, 908 F.3d 748, 759 (Fed. Cir. 2018) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 180 (2012)). Fatally for the government's position, Plaintiffs' interpretation "gives effect to every clause and word of a statute," while the government's interpretation does not. *Microsoft*

*Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 106 (2011) (internal quotation marks omitted).[5]

## D. The legislative history of the CDSOA and TFTEA undermines DOJ's "interpretation."

Plaintiffs agree that the Court need not delve into the legislative history. After all, courts are not permitted to consider legislative history except to clarify an *ambiguous* statute. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("As we have repeatedly held, the authoritative statement is the statutory text, not the legislative history or any other extrinsic material. Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms."). And the CDSOA *unambiguously* requires CBP to distribute delinquency interest. *See* Opening Br. 21-26.

---

[5] According to DOJ, "Congress did not say 'including all interest' when it described the type of interest to be deposited into the CDSOA special accounts" under § 1675c(e)(2), and § 1675c(d)(3) makes clear that "Congress knew how to say 'including all interest' when it so intended." Opp. 22. But the exact same negative implication can be drawn from the language of § 1675c(e)(2) (*i.e.*, Congress knows how to say "interest earned on such duties" and did not say so in § 1675c(d)(3)). And the benefit of Plaintiffs' reading is that it gives meaning to all the words in the statute.

14

To the extent the Court disagrees, however, the CDSOA's legislative history confirms that Plaintiffs' reading of the statute is correct. Plaintiffs' opening brief explores this legislative history in detail and explains why it is consistent with Plaintiffs' interpretation, not the DOJ's. *See* Opening Br. 27-29.

DOJ mounts a weak resistance against Plaintiffs' interpretation of the legislative history. First, it notes that the floor debates Plaintiffs cite do not explicitly discuss interest, and therefore concludes that "{t}he omission of 'interest' from the congressional discussions reveals an intent not to distribute section 1505(d) interest." Opp. 25. That misses the point. The floor comments simply confirm the *remedial purpose* of the CDSOA. As explained, this purpose is served by distributing delinquency interest to domestic producers, not by remitting it to the Treasury. *Supra* 12; Opening Br. 27-28.

DOJ next asks the Court to ignore the legislative history for the TFTEA, and for good reason—that legislative history explicitly says that DOJ's interpretation of the CDSOA was incorrect. The TFTEA was enacted to "correct[] CBP's misreading of the {CDSOA}," 162 Cong. Rec. S843 (daily ed. Feb 11, 2016) (statement of Sen. Thune), under which

"CBP ignored the direction of the statute to pay all interest to producers and instead deducted some types of interest from payments to producers." *Id.* The government balks at these statements, arguing that "{t}hese comments fall within the legislative history of TFTEA, not the legislative history of the CDSOA." Opp. 25. But there is no rule against using subsequent legislative history. *See Andrus v. Shell Oil Co.*, 446 U.S. 657, 666 n.8 (1980) ("{A}rguments predicated upon subsequent congressional actions … should not be rejected out of hand as a source that a court may consider in the search for legislative intent."); *see also United States v. Fisher*, 6 U.S. (2 Cranch) 358, 386 (1805) (Marshall, C.J.) ("Where the mind labors to discover the design of the legislature, it seizes every thing from which aid can be derived."). The subsequent legislative history of the TFTEA is useful here because it shows just how wrong CBP got it with respect to the CDSOA.

Besides, it is not just the legislative *history* of the TFTEA that undercuts the government's position, it is the *statute* itself. The TFTEA corrected CBP's mistaken interpretation of the CDSOA prospectively, as CBP admits. Opp. 25 ("{The TFTEA} … distribut{es} … section 1505(d) interest … from sureties received by Customs on or after October 1,

16

2014."). "Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980). The government is left to argue unpersuasively that the mere fact that Congress did not correct CBP's mistake "dating back to the CDSOA's inception," Opp. 25, suggests that Congress never intended for CBP to distribute delinquency interest under the CDSOA. But this argument is impossible to reconcile with the legislative history discussed above, which explains that CBP's decision to impound delinquency interest was contrary to the CDSOA.

## E. DOJ's interpretation is not a permissible reading of any statutory ambiguity.

As explained, DOJ's interpretation of the CDSOA is necessarily unreasonable because it is contrary to the plain text of the statute. Nonetheless, DOJ argues at *Chevron* Step Two that "distributing only section 1677g interest to ADPs is reasonable." Opp. 26. But DOJ asks the wrong question. It does not matter whether distributing only § 1677g interest is a "reasonable" thing to do in the abstract. Instead, assuming the CDSOA is ambiguous (and it is not), the *only* relevant question is whether *CBP* (not its counsel at DOJ in *post hoc* argument) has

17

reasonably interpreted whatever ambiguity the Court identifies. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) ("{A}gencies must operate 'within the bounds of reasonable interpretation.'" (quoting *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013))). And putting aside the absence of any record evidence that CBP ever adopted this "interpretation" while promulgating its regulation, *infra* Part III.A, DOJ has not explained how the interpretation is consistent with the remedial purpose of the CDSOA. *See Northpoint Tech., Ltd. v. FCC*, 412 F.3d 145, 151 (D.C. Cir. 2005) ("A 'reasonable' explanation of how an agency's interpretation serves the statute's objectives is the stuff of which a 'permissible' construction is made."). In other words, the text and structure of the CDSOA binds the government at *Chevron* Step Two as well as *Chevron* Step One.

## III. CBP's Faulty Administrative Action Is Not Entitled to Deference.

Even if this Court does find the CDSOA ambiguous, the Court should not defer to CBP's faulty administrative action under *Chevron* Step Two.

18

### A. Under *Encino Motorcars* and *Aqua Products*, CBP cannot receive deference for an "interpretation" that it did not analyze or explain in the record.

CBP's final regulation is due no deference as an "interpretation" of the CDSOA because CBP never actually "interpreted" the statute; rather, CBP ignored the statutory requirements due to a technological limitation. As the Federal Circuit has observed, "*Chevron* does not apply where an agency has not actually addressed the issue it purports to be within its discretion to address." *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1318 (Fed. Cir. 2017) (citing *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016) (holding *Chevron* deference is not warranted where the agency "did not analyze or explain why the statute should be interpreted" in a particular manner). As the ARS establishes, CBP originally intended to distribute delinquency interest, ARS 510-11, but changed its mind after issuing the proposed rule. ARS 577-79. Under penalty of perjury, the CBP representative stated that *the only reason* of which he is aware for that change is a technological limitation in CBP's system. ARS 006. CBP simply failed to "analyze or explain why the statute should be interpreted" to support its change in the record. *See Encino*, 136 S. Ct. at 2127. The only agency that could *potentially* receive

deference is CBP—not DOJ—but there is no statutory interpretation in the record to which this Court could defer. *See, e.g.*, *Montgomery Co. v. FCC*, 863 F.3d 485, 491 (6th Cir. 2017) ("Thus, if an agency wants the federal courts to adopt (much less defer to) its interpretation of a statute, the agency must do the work of actually interpreting it." (citing *Encino*, 136 S. Ct. at 2125)). That administrative failure cannot be overcome by DOJ's advancing a statutory interpretation in this litigation, some 20 years after the fact.

DOJ anticipated this weakness and argues that "{s}tatutory interpretations are a question of law," and "{a} party's version of the facts or alleged reason for doing something may be pretextual, but a question of law cannot be pretextual." Opp. 38. The government misses the point. CBP cannot receive deference for a "legal" justification, developed years later, that it did not analyze or explain in the record. *See Encino*, 136 S. Ct. at 2127. As the Supreme Court noted in *Encino Motorcars*, "Whatever *potential reasons* the Department might have given, the agency in fact gave almost no reasons at all." *Id.* (emphasis added). Or in this case, the only reason given in the record was a technological limitation. ARS 006. And "{i}t is not the role of the courts to speculate on reasons *that might*

*have supported* an agency's decision" that are not in the record. *Encino*, 136 S. Ct. at 2127 (emphasis added). Agencies cannot rely on an "explanation … for {an} action that is incongruent with what the record reveals." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575-76 (2019). DOJ is transparently papering over the fact that CBP disregarded the text of the CDSOA because CBP's computer systems could not do what the statute required.

### B. The dispositive word "only" is not in the text of the regulation, so *Chevron* deference does not apply.

DOJ's reading hinges on a single word in the *preamble* to the final rule—"only"—to exclude delinquency interest, and CBP "does not claim that the preamble in the Final Rule is a regulation entitled to deference." Opp. 29. That should be the end of the matter. The text of CBP's promulgated regulation simply says nothing about delinquency interest, one way or another. 19 C.F.R. § 159.64(e) ("However, statutory interest charged on antidumping and countervailing duties at liquidation will be transferred to the Special Account, when collected from the importer.").

DOJ continues to assert that "at liquidation" can mean only § 1677g interest, but this Court has already rejected the idea that this phrase, standing alone, conveys that meaning. Opinion 11-12. As this Court

correctly held, the regulation can only bear that meaning "when read together with the preamble language that pertained to it." *Id.* at 12; ECF No. 49 (May 2, 2019 H'rg Tr.) at 78:6-8 ("{I}f the preamble didn't exist, I would be inclined to agree with you that that reg isn't very clear on this point."). Preambles are not entitled to *Chevron* deference, Opening Br. 37-40, and DOJ does not seriously contend otherwise.[6]

Unable to rely on the word "only," DOJ resorts to relying on the principle of *expressio unius est exclusio alterius*, or the negative-implication canon. Essentially, because the regulation mentions one type of interest but not another, the type of interest not mentioned must be excluded. This canon of construction "must be applied with great caution, since its application depends so much on context." Scalia & Garner, *supra*, 107. It applies only where "the thing specified" can "reasonably be thought to be an expression of *all* that shares in the grant or prohibition involved." *Id.* The context here renders the negative-implication canon inapplicable. The CDSOA instructs CBP to distribute "all interest" to ADPs, and delinquency interest is a type of interest. *See* Opinion 11-12.

---

[6] CBP also does not argue that preamble is entitled to *Auer* deference. The argument is therefore waived. *See Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002).

Against that backdrop, the text of the *regulation*—which refers only to § 1677g interest—cannot reasonably be read to *exclude* delinquency interest. *Cf. NLRB v. Sw. Gen., Inc.*, 137 S. Ct. 929, 940 (2017) (negative inference "applies only when circumstances support{} a sensible inference that the term left out must have been meant to be excluded" (internal quotation omitted)).

Unsurprisingly, DOJ does not cite a single case applying the negative-implication canon to a *regulation* in order to reach a result that is at odds with the enabling *statute*. For good reason: A regulation cannot contradict a statue even when it purports to do so expressly. *See GHS Health Maint. Org., Inc. v. United States*, 536 F.3d 1293, 1297 (Fed. Cir. 2008) ("When a regulation directly contradicts a statute, the regulation must yield." (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (2002))). If a regulation cannot contradict a statute directly, it clearly cannot do so through a negative implication.

If CBP had meant for its regulation to say that it would distribute only § 1677g interest, it could have included the word "only" in the regulation, instead of burying it in the preamble to the final rule. Of course, CBP did not do so, perhaps because so blatantly violating the

plain text of the CDSOA would have been immediately challenged in court. *Cf. La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("{A}n agency literally has no power to act … unless and until Congress confers power upon it."). Instead, CBP promulgated a regulation the text of which is, at best for CBP, *silent* about delinquency interest, and now DOJ tries to exploit that regulatory silence to reach a result that is at odds with the statute. The Court should reject the government's tactics.

## C. If CBP is correct that its final rule excludes delinquency interest, the rule is arbitrary and capricious.

If CBP's final rule actually means what DOJ says it means, the rule is arbitrary and capricious and deserves no deference because the agency made an about face after issuing the proposed rule without explanation. *Compare* ARS 510-11 *with* ARS 577-79. When an agency changes course, it must explain why. *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("{T}he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained."). This change was "issued without the reasoned explanation that was required in light of the {the agency's} change in

position and the significant reliance interests involved." *Encino*, 136 S. Ct. at 2126. Such action is arbitrary and capricious.

There is no contemporaneous explanation in the record as to why CBP changed course, and certainly none that was explained to the public as part of the notice-and-comment process. *See Nat'l Black Media Coal. v. FCC*, 791 F.2d 1016, 1023 (2d Cir. 1986) ("Unfairness results unless persons are sufficiently alerted to likely alternatives so that they know whether their interests are at stake." (cleaned up)). Rather, CBP's decision on delinquency interest was communicated (if at all) in the preamble to the final rule. *Supra* 21-24. "Because the adoption of a substantive policy in a preamble added to a regulation after notice and comment is procedurally improper, such a policy cannot be the source of an interpretation to which a court defers." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 76 (1st Cir. 2018) (citations omitted).

CBP argues that it was entitled to change its mind during the course of promulgating its final rule. In general, agencies are permitted to change their positions. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Agencies can even change their positions between a proposed rule and a final rule, provided the final rule is a "logical

outgrowth" of the proposal. *See Veterans Justice Grp., LLC v. Sec'y of Veterans Affairs*, 818 F.3d 1336, 1344 (Fed. Cir. 2016). The problem here is that CBP never explained what it was doing.

Because of the lack of an explanation, CBP's about-face on delinquency interest is different in kind than the other examples of changes that CBP highlights. *Contra* Opp. 30. DOJ notes that at one point CBP considered periodic instead of annual distributions and considered distributing funds that were not actually collected by CBP instead of duties actually received. But as DOJ's own parentheticals note, the "NPRM provid{ed} for" these position changes, Opp. 30-31—*i.e.*, they were explicitly addressed in the NPRM. Similarly, although CBP initially "contemplated paying interest on the funds in the special account," DOJ admits that CBP's decision not to make the special accounts interest bearing was "reflected in the NPRM." Opp. 31. Because these decisions were communicated in the proposed rule, they were all subject to notice and comment. By contrast, CBP's decision not to distribute delinquency interest was left unspoken until the preamble to the final rule.[7] DOJ's

---

[7] CBP did not "provide for" this interpretation in its notice-and-comment rulemaking; this Court has already held that CBP's position with respect

argument that the public was not entitled to "an in-depth discussion of the agency's technological limitations," Opp. 37, is flatly wrong; CBP was required to disclose the substance of, and basis for, the change it made. *Chenery Corp.*, 318 U.S. at 94.

Recognizing that its position is indefensible, DOJ now states that "by the time the NPRM was published in June 2001, Customs did not intend for section 159.64(e) to distribute section 1505(d) interest." Opp. 31. DOJ points to no support for this assertion in the record, and in fact the record suggests that the last decision made by CBP with respect to delinquency interest prior to publication of the proposed rule was to include delinquency interest in the distributions. *See* ARS 510-11. CBP decided not to distribute delinquency interest *after* the proposed rule was already published. *See* ARS 577-79.

---

to delinquency interest was expressed only in the preamble to the final rule, Opinion 11-12, and thus *was not available for public comment*. Here, the preamble was not subject to notice and comment. *See N.H. Hosp. Ass'n*, 887 F.3d at 76; *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1393 (9th Cir. 1995). Thus, the fact that "several public commenters," Opp. 23; *id*. at 9, 40, did not comment on delinquency interest—something that was completely absent from the proposed rule, and which was contrary to the plain text of the CDSOA—is unsurprising and does not help CBP's case here. The lack of comments means that regulated parties simply did not understand what CBP was doing.

And even if the record were unclear on this point (and it is not), nothing in the record supports the DOJ's position that CBP decided not to distribute delinquency interest *before* the proposed rule. "{I}n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Com.*, 139 S. Ct. at 2573 (citing *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978)). Thus, agency action is evaluated based on "an agency's stated reasons." *Id*. The Court therefore should not credit DOJ's *post hoc* rationalizations, and instead must look to what the record actually says: CBP ignored the text of the CDSOA due to a technological limitation.

### D.   CBP's remaining arguments are unpersuasive.

Each of CBP's remaining arguments is deeply flawed as a matter of administrative law. ***First***, CBP contends that it has interpretive authority over the CDSOA. *See* Opp. 27. Regardless of whether that is true as a general matter,[8] under *Chevron* and *Mead*, an agency is only

---

[8] The CDSOA directs CBP only to create "procedures for distribution," of CDSOA funds and enact "regulation[s]" governing the "time and manner" of such distributions, 19 U.S.C. § 1675c(c), (e)(3). CBP's decision that delinquency interest should not be distributed—communicated in a preamble, not a regulation—far exceeds this limited delegation of

permitted to exercise that interpretive authority to fill the gaps in a statute that arise as a result of ambiguity, which is considered a congressional delegation of policymaking discretion to the agency. *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). If a statute is not ambiguous (and the CDSOA is not), then CBP has no interpretive authority; it must follow the clearly expressed intent of Congress. "Where a statute's language carries a plain meaning, the duty of an administrative agency is to follow its commands as written, not to supplant those commands with others it may prefer." *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018) (citing *Soc. Sec. Bd. v. Nierotko*, 327 U.S. 358, 369 (1946)). Congress has simply not delegated to CBP the discretion to decide whether delinquency interest should be distributed, so it does not matter whether CBP might have interpretive authority over other ambiguities in the CDSOA generally.

**Second**, CBP contends that the preamble merely clarifies its regulation. It does not. As an initial matter, Plaintiffs maintain that the obscure reference in the preamble did not give Plaintiffs notice that CBP

---

authority. *See, e.g.*, *Gonzales v. Oregon*, 546 U.S. 243, 258 (2006); *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).

intended to withhold § 1505(d) delinquency interest. But even on the government's reading (and the one previously adopted by this Court), the preamble *changes* the meaning of the regulation, which, on its face, says nothing about delinquency interest. *Supra* 21-24; *see also* Opening Br. 35-36. The word "only" in the preamble does far more than clarify the final rule—it determines that one of the two types of interest encompassed by the statutory text "all interest" will not be distributed. Preambles are not formal agency action and therefore cannot bind the public. *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 569-70 (D.C. Cir. 2002) (per curiam). And a preamble certainly cannot overcome the plain language of a *statute*. *Cf. Hymas v. United States*, 810 F.3d 1312, 1323 (Fed. Cir. 2016).[9]

---

[9] CBP says that "Plaintiffs' contention that Customs is only authorized to act by regulation, which does not include decisions articulated only in a preamble, similarly misses the mark." Opp. 28. To the extent that CBP means to argue that it *can* act through opaque language in a mistitled comment included in a preamble, it could not be more wrong. *See Nat'l Wildlife Fed'n*, 286 F.3d at 569-70. One of the most fundamental limitations of the modern administrative state is that an agency cannot bind the public except through strict adherence to the procedural requirements of the APA. *See Splane v. West*, 216 F.3d 1058, 1063 (Fed. Cir. 2000).

**Third**, CBP's cited cases are inapposite. *S. Shrimp All. v. United States*, 617 F. Supp. 2d 1334 (Ct. Int'l Trade 2009) (per curiam), is a case involving deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), not *Chevron*. *Skidmore* does *not* depend on congressional delegation of policymaking or gap-filling authority. Instead, the agency's interpretation is essentially given consideration based on how persuasive it is—based on its "thoroughness, logic, and expertness." *S. Shrimp All.*, 617 F. Supp. 2d at 1345 (quoting *Mead*, 533 U.S. at 235). Here, CBP's interpretation in the preamble is inconsistent with the text of the CDSOA and should be disregarded under *Skidmore*. And *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735 (1996), is irrelevant because CBP's interpretation of the word "interest" is not at issue here. This Court has already decided that delinquency interest is a type of interest. Opinion 12 ("{D}elinquency interest collected according to 19 U.S.C. § 1505(d) unquestionably is 'interest.'"). The interpretive question in this case is whether "all interest" encompasses delinquency interest. *Smiley* sheds no light on that question.

## IV.   The Court Should Reconsider Its Ruling on CBP's Motion to Dismiss.

The Court should also reconsider its earlier ruling dismissing a portion of Plaintiffs' claims as being time-barred. The Court issued that decision without the benefit of the ARS, with its associated revelations about CBP's conduct: (1) CBP believed at the time of the proposed rule that it was required to distribute delinquency interest to ADPs, *see* ARS 510-11, (2) CBP decided after publishing the proposed rule not to distribute delinquency interest to ADPs, *see* ARS 577-79, and (3) a technical limitation is the only reason given in the record for the decision not to distribute delinquency interest, *see* ARS 006. It appears that CBP, like the rest of the public, initially thought that the clearest reading of the CDSOA was that it had to distribute delinquency interest. The public cannot be expected to wade through an obscure section of the preamble in search of a "clarification" that is contrary to the statute and only based on a technical limitation that CBP hid until years after publication of the final rule. The ARS thus confirms that Plaintiffs did not have notice (either legal or actual) of CBP's *ultra vires* decision to impound delinquency interest.

At bottom, the record makes clear that CBP changed its position with respect to delinquency interest between the proposed and final rules, and impermissibly communicated that change only in the regulatory preamble, if at all. But preambles cannot *change* a regulation, they can only (in some circumstances) *clarify* a regulation. Agencies are afforded a presumption of regularity, and Plaintiffs were not required to assume that CBP would impermissibly use a preamble to change the regulation from one that is consistent with the CDSOA to one that contradicts it. This *ultra vires* action cannot provide notice sufficient to bar a claim.

CBP's reliance on the law-of-the-case doctrine to oppose reconsideration is misplaced. CBP cannot seriously dispute the "availability of new evidence," which CBP admits is sufficient for this Court to reconsider an interlocutory order. Opp. 39 (quoting *Ford Motor Co. v. United States*, 30 CIT 1587, 1588 (2006)). The "new evidence" is the supplemental record that CBP had to file as a result of Plaintiffs' motion (which Plaintiffs filed because CBP's initial record was deficient). Moreover, CBP's statement that "the decision not to distribute section

1505(d) under the CDSOA was made prior to the publication of the NPRM," Opp. 39, finds absolutely no support in the record. *Supra* 26-28.

Finally, CBP's argument that the public had notice because "six public commenters agreed with Customs' treatment of interest as proposed in section 159.64(e)," Opp. 40, is unpersuasive. CBP published the proposed rule while under the impression that it was required to distribute delinquency interest. These commenters would have had no reason, based on the text of the proposed rule, to think that CBP was planning to do anything other than what the statute says (*i.e.*, distribute delinquency interest). Plaintiffs were simply not on notice that CBP would not distribute delinquency interest, and this Court should reconsider and ultimately vacate its holding otherwise.

## CONCLUSION

For these reasons, this Court should grant judgment to the Plaintiffs on the administrative record and reconsider its prior order dismissing in part Plaintiffs' claims.

Respectfully submitted,

/s/ *J. Michael Taylor*

J. Michael Taylor
Jeffrey M. Telep
Jeremy M. Bylund
Neal J. Reynolds
KING & SPALDING LLP
1730 Pennsylvania Ave., NW
Washington, D.C. 20006
(202) 737-0500

*Counsel to Plaintiffs*

Date: October 8, 2021

## CERTIFICATE OF COMPLIANCE WITH THE
## COURT OF INTERNATIONAL TRADE'S STANDARD
## CHAMBERS PROCEDURES

As required by the Court's Standard Chamber Procedures, the undersigned certifies that this brief complies with the word count specified there. In particular, the undersigned certifies that the brief includes 6,985 words and therefore does not exceed the 7,000 words allowed by Chambers Procedure 2(B)(1)(a).

Date: October 8, 2021

/s/ *J. Michael Taylor*
J. Michael Taylor

**CERTIFICATE OF SERVICE FOR ELECTRONIC FILING**

I hereby certify that on this day, October 8, 2021, I caused this document to be filed electronically at the U.S. Court of International Trade. I understand that the Court's transmission of the Notice of Electronic Filing of this document constitutes service to all parties pursuant to the Court's rule for mandatory e-service.

/s/ *J. Michael Taylor*
J. Michael Taylor